David T. HAM and Patricia Ham,
Plaintiffs–Appellants,

v.

PENNZOIL COMPANY,
Defendant–Appellee.

No. 88–3364
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

April 10, 1989.

Michael E. Holoway, Jack E. Truitt, Metairie, La., for plaintiffs-appellants.

Don K. Haycraft, Liskow & Lewis, New Orleans, La., for defendant-appellee.

Before RUBIN, GARWOOD, and DAVIS, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A worker employed by a company that performed workovers on oil wells was injured while engaged in such an operation on a platform owned by an oil company. That company had contracted with his employer for the job. He seeks to recover damages for his injuries from the oil company. After a bench trial, the district court found that (1) the oil company did not have operational control over the work being done by the worker's employer, an independent contractor, and (2) the well being worked on was not such a defective object

as to impose liability on the company under La.Civil Code Arts. 2315 and 2317. The findings of fact are supported by the record and the conclusions of law are correct. We therefore affirm.

## I.

On or about November 6, 1986, Dave T. Ham was employed by Services Equipment Engineering, Inc. as a roughneck aboard a platform situated on the outer continental shelf. That platform was owned and operated by Pennzoil, which had contracted with SEE to perform workover operations on a well that had been drilled from the platform.

The drilling contract between SEE and Pennzoil described SEE as an "independent contractor." It further stated that Pennzoil "is interested only in the results obtained and has only the general right of inspection and supervision to secure the satisfactory completion of any such work [completion of workover operations]."

In order to insure that the work would be performed according to Pennzoil's rules, regulations and specifications, a Pennzoil company representative, James Manning, was stationed aboard the platform. His duties included being present on the drill floor when a well began "swabbing" to monitor the situation. Left unchecked, swabbing may result in a "kick," or rush of pressurized drilling fluid, which might create a dangerous situation.

In the course of the workover on the evening of November 5, 1986, the SEE drilling crew began pulling the drill pipe—to the end of which the packer was connected—out of the wellbore. The toolpusher and day-tour driller, a SEE employee named James Hall, observed that the hole was swabbing at approximately 11:00 p.m. Swabbing indicates that the rubber seal around the packer that is being pulled has not yet resumed its smaller diameter original position. It is a common occurrence when pulling this particular piece of equipment out of the wellbore.

As unequal pressures in the wellbore may develop if swabbing is left unchecked, the toolpusher ordered the members of his SEE crew to pull the drill pipe up slowly and then slack it off. The working of the packer's rubber seal on the inside wall of the casing causes the rubber to retract or wear off and then allows the fluid to fall down around the packer so that wellbore pressures maintain an equilibrium above and below the packer. The drilling operations expert witness called by Ham, Robert Kubelka, testified that this is an accepted way to deal with swabbing.

Hall and Roland Kern, the SEE night tool pusher, observed that after the pipe was reciprocated in this manner, the fluid began to drop properly. At this point the drill crew began removing the pipe slowly from the hole. This kind of removal ensures that even if tolerances between the packer and casing remain small, the drilling fluid has a chance to drop, keeping the equilibrium in wellbore pressures. Kubelka also testified that this procedure is prudent.

Shortly after midnight, after watching a number of stands of pipe being pulled out of the hole without difficulty, both Kern and Manning, the Pennzoil's company representative, retired for the night. The night tour, which included Ham, came on duty at midnight and continued pulling pipe out of the hole over the next three and one half hours. They pulled one stand approximately every five minutes, a slow rate of speed. Jim Waller, the night-tour driller, testified that no swabbing or flowing occurred during this time. This was corroborated by the IADC daily drilling log for the hours between midnight (2400) and 3:30 a.m. (0330) on November 6. Removal of the drill pipe required that the lost volume be replaced with a like volume of drilling fluid and the wellbore took the proper amount. This meant that the wellbore pressures were maintaining an equilibrium and that no influxes of formation hydrocarbons were occurring.

At approximately 3:30 a.m., the well began flowing in a "kick." At that point, Waller ordered his drill crew, which included Ham, to install a TIW valve. This valve is a cylindrical safety valve weighing be-

tween 100 and 125 pounds with an open bore that is threaded. In use the valve is screwed ("stabbed") onto the top of the drill pipe sticking up through the rotary table on the rig floor. When the valve is closed, the drilling fluid that is flowing up through the annulus of the drill pipe is shut off. Ham and Williamson raised the valve from the drill floor and attempted to place it on top of the drill pipe. Unfortunately, they placed the valve in a cocked position so that the flow of fluid from the pipe knocked the valve over. As the valve fell, it struck Ham in the face. He was knocked to the ground and suffered injuries to his lower back.

Manning, the Pennzoil company man, was not on the drill floor at the time and had not been there for more than three hours. Moreover, he had no responsibility for the SEE crew stabbing the TIW valve, an operation that the SEE drilling crew routinely performed each 12-hour tour.

Ham asserts that, through Manning, Pennzoil exercised operational control over the operation in progress. The drilling contract specifically stated that SEE was Pennzoil's independent contractor and that Pennzoil had a general right of inspection and supervision. It also stated, however, that Pennzoil did not have the right to control or direct the details of the work performed by SEE. There is evidence that this contractual splitting of the duties and responsibilities for the workover job was in fact followed on the rig. SEE owned and operated the rig and related tools and supplied the drilling crew that conducted the drilling operations. Manning was on the rig solely to monitor these activities. The activities themselves were in the control of the SEE drilling crew. In the hours leading up to Ham's accident, the SEE crew had the responsibility for pulling the drill pipe out of the hole.

The mere fact that Pennzoil maintained a "company man" on the drilling rig does not demonstrate that it retained control of the project.[1] In its most recent analysis of Louisiana law in this context, this court has emphasized that the relationship between the principal and the independent contractor is in large measure determined by the terms of the contract itself.[2] Manning performed the usual "company man" duties in this drilling context. That Pennzoil required SEE to perform the workover job according to its plans for the well does not mean that Pennzoil controlled the operational details.[3]

In *Bartholomew v. CNG Producing Co.*[4] the jury found that the company man told the drilling crew not to wash the rig floor, the condition of which caused Bartholomew's slip and fall accident on a wet and muddy surface. Pennzoil's activities in this case were in no way similar. The district court expressly found that Manning had no such involvement. Pulling the pipe out of the hole and stabbing the TIW valve were in SEE's hands. Manning gave no unsafe orders and he did not expressly or impliedly authorize any unsafe practices.

## II.

■ The principal issue is whether the experienced trial judge credited the wrong version of events. Ham told one version. Several other witnesses and the documentary evidence contradicted his story. The trial judge found the evidence presented by the defendant to be more credible. That was both his province and his duty. It is our duty to affirm him unless he was clearly erroneous.[5] As his findings are amply supported by the record, we in turn perform our duty and affirm his finding that Pennzoil was neither vicariously nor independently negligent in Ham's accident.

1. *See Ainsworth v. Shell Offshore, Inc.,* 829 F.2d 548, 550 (5th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1593, 99 L.Ed.2d 908 (1988).

2. *See Ainsworth,* 829 F.2d at 550, *quoting Hemphill v. State Farm Ins. Co.,* 472 So.2d 320, 322 (La.App. 3d Cir.1985).

3. *See, e.g., Wallace v. Oceaneering International,* 727 F.2d 427, 436–37 (5th Cir.1984).

4. 832 F.2d 326 (5th Cir.1987).

5. Fed.R.Civ.Proc. 52(a).

### III.

▮ Ham contends that even if Pennzoil was not negligent, it nevertheless should be held strictly liable because the flowing wellbore created a defective "situation" and any injury that occurred in relation to the flowing should be Pennzoil's responsibility.

The prerequisites to liability under Article 2317 are proof that:

(1) The thing that caused the damage was in the custody of the defendant;

(2) The thing was defective; and

(3) The plaintiff's damages were caused by the defect.[6] The inapplicability of Article 2317 is apparent merely from the recitation of these criteria. Neither the well nor the TIW valve was defective within the meaning of the code article. Neither the kick nor the well flow was a defect of a "thing" within the meaning of La.Civ.Code Art. 2317. In addition, as Pennzoil did not have physical custody of the well or the equipment, it could not have had custody of a defective thing.

Ham cites no case that has declared a flowing well to be inherently defective. The facts of this case, moreover, do not support such a theory. Ham was injured while performing the routine operation of installing a TIW valve on top of a stand of drill pipe. As a well is supposed to flow, the flowing of the well was not in itself a defect. The well or the valve is not rendered defective because the installation of the valve was dangerous.

Finally, the trial court found as fact that Pennzoil did not have custody over the wellbore in any event.

For these reasons, the judgment is AFFIRMED.

---

**6.** *See Ainsworth,* 829 F.2d at 551; *Loescher v. Parr,* 324 So.2d 441 (La.1975).