**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 93-3382

SHARON S. DUPRE, Widow of Russell P.
Dupre, individually and as natural
tutrix of her minor child, Beau
Nicholas Dupre,

Plaintiff-Appellant,

versus

CHEVRON U.S.A., INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

(April 25, 1994)

Before POLITZ, Chief Judge, JONES, Circuit Judge, and FULLAM,[*]
District Judge.

POLITZ, Chief Judge:

Sharon S. Dupre, individually and as natural tutrix of the

minor Beau Nicholas Dupre, appeals an adverse summary judgment

dismissing their claims against Chevron U.S.A., Inc. for damages

resulting from the death of Russell P. Dupre, their husband and

---

[*]District Judge for the Eastern District of Pennsylvania,
sitting by designation.

father, respectively.  For the reasons assigned, we vacate and remand.

Background

Russell Dupre, a driller employed by Sundowner Offshore Services, Inc., was killed while working on Chevron's outer continental shelf platform located off the coast of Louisiana. Sundowner contracted with Chevron to install a drilling rig on Chevron's platform and to perform workover operations on its wells. Chevron reserved and exercised its right to approve Sundowner's rig installation. The platform revision resulting from installation of Sundowner's rig could only be accomplished with the specific permission of Chevron.  This permission was given.

Under the Chevron-approved plan Sundowner placed its rig on the outer edge of the platform with a portion extending beyond the brink of the platform and over the sea.  The Sundowner rig stood approximately 21 feet above the drilling deck of Chevron's platform and it was composed of several component parts.  A traction motor blower sat atop the traction motor which was housed on a drilling skid located well above the rig rotary table and platform floor.

Guardrails protected the perimeter of Chevron's platform. The addition of Sundowner's rig, which added a workspace above the rails and over the edge of the platform, markedly changed the dynamics of this area of Chevron's platform.  No guardrails or other protective device were built around the outer edges of the elevated Sundowner rig.  None were placed around the traction motor at the top of the rig.  Access to the traction motor, which

required regular maintenance and inspection, was hampered by its limited work area and the outboard location of its service port. Chevron's safety inspectors checked the rig for regulatory and safety compliance but did not comment on any dangers involved in the rig configuration.

One month after installation of the rig, Russell Dupre and Johnny Walker, a fellow Sundowner employee, were instructed to climb to the top of the rig, remove the blower motor, and inspect the inside of the traction motor. The traction motor had begun smoking and operations could not resume until it was repaired. Dupre and Walker unbolted the blower motor but could not pry it loose. They then rocked the motor back and forth in order to loosen it. The motor suddenly broke free and fell toward the outboard side of the rig. Dupre lost his balance and was pulled or fell off the structure, falling to his death in the sea.

Sharon Dupre, individually and in her representative capacity, filed suit against Chevron alleging negligence and strict liability.[1] The district court granted summary judgment to Chevron, considering only vicarious liability principles. Sharon Dupre timely appeals, focusing on her negligence claim under Louisiana Civil Code article 2315.

### Analysis

We review grants of summary judgment *de novo*, applying the

---

[1]Dupre also sued I.M.I. Engineering Co., the manufacturer of the rig, who was released on summary judgment. That judgment has not been appealed.

same standard as that applied by the district court.[2]  Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[3]  Applying Louisiana law[4] we find summary judgment inappropriate.  Sharon Dupre filed a claim against Chevron alleging that it negligently and directly caused her husband's death.  She did not merely assert a vicarious liability claim; the district court erred in so treating her complaint.[5]  Concluding that Chevron owed a duty to Russell Dupre under Louisiana Civil Code article 2315, we must vacate and remand for further proceedings.[6]

Article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."[7]  In determining "fault," Louisiana courts apply a duty-risk analysis composed of three parts:

---

[2]**Wilkerson v. Columbus Separate School Dist.**, 985 F.2d 815 (5th Cir. 1993).

[3]**Id.**

[4]The Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.*, extends the law of the adjacent state, which becomes the law of the United States, to actions arising from injuries on outer continental shelf platforms.

[5]See **Seneca v. Phillips Petroleum Co.**, 963 F.2d 762 (5th Cir. 1992) (distinguishing claims for direct liability from claims based on vicarious liability).

[6]The dissent suggests that we are here deciding the issue of liability.  We do not.  Our focus is on Chevron's duty separate and apart from vicarious liability.  In that regard we note that vicarious liability was the issue before the court a` quo and was the issue in many of the cases cited in the dissent.  The factual determination of liability remains for the trier-of-fact.

[7]La. Civ. Code art. 2315.

4

            (1)   Was the defendant's conduct a cause-in-fact of
                  the harm?

            (2)   Was a duty imposed on the defendant by a
                  general rule of law to protect this plaintiff
                  from this type of harm arising in this manner?

            (3)   Was that duty breached?

In Louisiana the existence of a duty and its scope are questions of law.[8]  Duty varies depending on the facts, circumstances, and context of each case[9] and is limited by the particular risk, harm, and plaintiff involved.[10]  On the facts presented in this case, we find that a duty existed.

     As a general rule, "the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm."[11]  This duty extends to employees of independent contractors, for whose benefit the owner must take reasonable steps to ensure a safe working environment.[12] Chevron owed a duty to Russell Dupre and other workers aboard its

---

     [8]**Mundy v. Dep't of Health and Human Resources**, 620 So.2d 811 (La. 1993); see also **Ellison v. Conoco, Inc.**, 950 F.2d 1196 (5th Cir. 1992), cert. denied, 113 S.Ct. 3003 (1993).

     [9]**Roberts v. Benoit**, 605 So.2d 1032 (La. 1992); see also **Ellison**; **Owen v. Kerr-McGee Corp.**, 698 F.2d 236 (5th Cir. 1983); **Bourg v. Texaco Oil Co., Inc.**, 578 F.2d 1117 (5th Cir. 1978).

     [10]**Roberts**; see also **Ellison**.

     [11]**Mundy**, 620 So.2d at 813; see also **Owen**, 698 F.2d at 239.

     [12]**Boudreaux v. Exxon Co., U.S.A.**, 451 So.2d 85 (La.App.), writ denied, 458 So.2d 119 (La. 1984); **Stoute v. Mobil Oil Corp.**, 297 So.2d 276 (La.App.), writ denied, 300 So.2d 839 (La. 1974); see also **Bourg**.

platform to ensure that the platform was reasonably safe. As demonstrated by the plethora of regulations,[13] work aboard an offshore platform is precarious at best. Slipping and losing one's balance, a not unusual occurrence on oil-producing rigs, may become life threatening when the proper safety mechanisms are not in place. A broken ramp or a missing rail may become the cause of severe injury or death. Such safety features are required for the precise purpose of preventing undue consequences of falls which may end abruptly in the sea hundreds of feet below.

Sharon Dupre asserts that Chevron neglected certain regulations and that this was the cause of her husband's death. 33 C.F.R. § 142.4 provides that holders of leases on the outer continental shelf "shall ensure that all places of employment . . . are maintained in compliance with workplace safety and health regulations . . . and, in addition, free from recognized hazards."[14] Recognized hazards include conditions "[g]enerally known among persons in the affected industry as causing or likely to cause death or serious physical harm to persons exposed" and conditions "[r]outinely controlled in the affected industry."[15] Section 143.110 controls the placement of guardrails, explaining that "[e]xcept for . . . areas not normally occupied, the unprotected

---

[13]Although the violation of these regulations does not constitute negligence *per se*, they may be relevant in the establishment of the standard of care owed by a particular defendant to a particular plaintiff. **Romero v. Mobil Exploration and Producing North America, Inc.**, 939 F.2d 307 (5th Cir. 1991).

[14]33 C.F.R. § 142.4(a).

[15]33 C.F.R. § 142.4(c)(1)(2).

perimeter of all floor or deck areas and openings shall be rimmed with guards and rails or wire mesh fence."[16]  The American Petroleum Institute further requires that "[p]rior to commencing rig-up operations, the planned arrangement of all equipment to be placed on the location should be reviewed to eliminate potentially hazardous conditions."[17]

The summary judgment record contains expert testimony to the effect that the set-up and placement of the Sundowner rig on Chevron's platform created a recognized hazard.  According to this testimony the rig's placement on the edge of the platform, coupled with its insufficient work area and lack of guardrails around the traction motor, created a danger to the workers required to service the motor.  Unlike the typical vicarious liability case in which the independent contractor created the danger,[18] in this case Chevron specifically authorized any hazardous situation created when it expressly approved the plan submitted by Sundowner for the installation and set-up of its rig.[19]  Upon completion, as noted, this addition changed the dynamics of the platform workbase.  With

_____

[16]33 C.F.R. § 143.110(a).

[17]American Petroleum Institute:  Recommended Practice for Occupational Safety for Oil and Gas Well Drilling and Servicing Operations (RP 54) 5.3.1.

[18]See **Verrett v. Louisiana World Exposition, Inc.**, 503 So.2d 203 (La.App.), writ denied, 506 So.2d 1229 (La. 1987); see also **Robertson v. Arco Oil & Gas Co.**, 948 F.2d 132 (5th Cir. 1991); **Zepherin v. Conoco Oil Co.**, 884 F.2d 212 (5th Cir. 1989).

[19]See, e.g., **Ham v. Pennzoil Co.**, 869 F.2d 840 (5th Cir. 1989), which suggests that knowledge or the express or implied approval of a dangerous situation implicates liability.

Chevron's approval, certain of the rails around the platform became useless, their function of preventing undue consequences of accidental falls neutered, as the "normally occupied areas" of the platform in critical part became elevated beyond their reach. The platform, with its appropriate safety devices, was thus reconfigured into a new model, one which called for new measures to ensure safety in the newly created normally occupied areas. Such additional safety features, like those on the "old" platform, would have as their purpose the prevention of accidental injury to workers such as Russell Dupre -- specifically, to prevent employees from falling overboard with resulting serious injury or death.

We thus conclude that Chevron had a duty to take reasonable steps to make and keep its platform safe for workers thereon. This duty included areas of its platform altered or modified with its knowledge and approval. Chevron had the duty of assuring that any modifications or additions it allowed to its platform would not contain recognizable hazards and that all normally occupied areas, including any newly created normally occupied areas, would continue to be adequately protected.

We cannot say as a matter of law that Chevron did not breach this duty, therefore summary judgment in favor of Chevron was inappropriate. The question is a factual one; further proceedings are required.

The judgment of the district court is VACATED and the matter is REMANDED for further proceedings consistent herewith.

Edith H. Jones, Circuit Judge, dissenting:

Because a proper application of Louisiana law indicates that Chevron was entitled to the summary judgment granted by the district court, I must respectfully dissent.

Chevron hired an experienced independent contractor to perform drilling work on its platform that required expertise that Chevron itself did not possess. The entire rig that was involved in Mr. Dupre's unfortunate accident belonged to, was designed by, and was operated by Sundowner. Mrs. Dupre certainly could look to Sundowner, her husband's employer, for compensation. I disagree, however, that Chevron owed Mr. Dupre a duty under Louisiana law under the facts of this case.

The majority argues from first principles of Louisiana tort law, but in fact, I have found no Louisiana case that has held a principal liable for the injury of an independent contractor's employee on the basis of the principal's duty to maintain a reasonably safe workplace. By contrast, a long line of summary judgment cases founded on Louisiana law supports the decision of the district court here. For instance, in Boutwell v. Chevron U.S.A., Inc., 864 F.2d 406 (5th Cir. 1989), which arose from an offshore platform injury, the defendant's "company man" was aware that the independent contractor had put holes in the deck of the platform. The court held, however, that Chevron was not negligent when an independent contractor's employee fell in one of the holes because Chevron retained no rights of supervision that limited the independent contractor's ability to perform the work in its own way. Similarly, in Grammer v. Patterson Servs., Inc., 860 F.2d 639

(5th Cir. 1988), cert. denied, 491 U.S. 906 (1989), the principal required its independent contractor to change its test to ensure a higher pass rate for acceptable pipe fixtures. Nevertheless, it was held that the defendant did not exercise sufficient operational control over the independent contractor to be held liable for negligence because its actions exhibited no control over the manner in which the work was to be performed. Particularly analogous is Ainsworth v. Shell Offshore, Inc., 829 F.2d 548 (5th Cir. 1987), cert. denied, 485 U.S. 1034 (1988), in which the Shell "company man" on the offshore platform had knowledge that its subcontractor was working its crew without lights at night; this court held that Shell had no duty to intercede in its subcontractor's decision to work without lights. See also Hawkins v. Evans Cooperage Co., Inc., 766 F.2d 904 (5th Cir. 1985) (principal not liable because it did not exercise control over the independent contractor and had no duty to discover and remedy hazards created by the acts of the independent contractor).

The majority has accepted the plaintiff's attempt to distinguish these uniformly adverse precedents by asserting that Chevron is liable for its own negligence. The record does not, however, support this position. Contrary to the implication of the majority opinion, nothing in the record before us suggests that Chevron reserved and exercised a right to approve -- on safety grounds -- the installation of the Sundowner V. There is no reason to suppose that Chevron's approval of Sundowner V was related to the safety of the rig, as the rig was entirely composed of

10

Sundowner equipment. The decision whether to place guardrails around the outer edges of the elevated Sundowner rig and the traction motor atop it were the responsibility of Sundowner; Chevron had nothing to do with the design and use of Sundowner's own equipment. Moreover, the fact that the Sundowner V extended beyond the outer edges of the platform was, as indicated in the affidavit of the plaintiff's own expert, common offshore practice. It cannot be overemphasized that Chevron's mere approval of Sundowner's installation drawings cannot create a fact issue on Chevron's possible negligence under our past authorities. If that is what the majority holds, their ruling is inconsistent with Boutwell and Ainsworth, where the acquiescence of the principal in arguably dangerous practices involving the principal's platform did not create a duty.

Moreover, the majority cannot bootstrap their finding of a duty from the fact that Chevron provided safety inspectors who occasionally checked Sundowner's rig for safety compliance. Louisiana law preempts such reasoning. See LeJeune v. Shell Oil Co., 950 F.2d 267 (5th Cir. 1992); Duplantis v. Shell Offshore, Inc., 948 F.2d 187 (5th Cir. 1991). Chevron's inspection checklist -- which was signed by both a Chevron and a Sundowner representative at each inspection -- explicitly provided:

> It is understood that compliance with all applicable legal requirements and the safe conduct of all drilling operations are and remain the responsibility of any contractor executing a drilling contract or operation for Chevron. Chevron's maintenance and use of the above and foregoing checklist procedure shall in no manner whatsoever modify, waive, or alleviate the duties and obligations of contractor or modify or enhance Chevron's

11

> duties or responsibilities with respect thereto whether under contract or by law or otherwise.

See, e.g., LeJeune, supra (the relationship between the principal and independent contractor is determined in large measure by the terms of the contract even though Shell had a manual for independent contractor safety and examined the area to be worked on to determine whether it was safe); Boutwell, supra (the language of the contract between the principal and its independent contractor dictates and is primarily controlling when determining the responsibilities of the parties).

It is also erroneous to cite various federal regulations in support of a duty running from Chevron to Mr. Dupre to provide a workplace free from recognized hazards. The majority focus on testimony to the effect that the set-up and placement of the Sundowner rig on Chevron's platform created a "recognized hazard," a term used in some of the regulations. However, this circuit has rejected the argument that an MMS regulation can create a duty upon a platform owner. See Romero v. Mobil Exploration and Producing N. Am., Inc., 939 F.2d 307, 309-10 (5th Cir. 1991) (concluding that no cause of action arises merely from the breach of an MMS regulation because the regulations were not created solely to provide safeguards or precautions for the safety of others). A private citizen is not afforded a cause of action because of a violation of an MMS provision. Instead, private citizens are merely empowered to commence civil actions to compel compliance with the provisions. See id. at 309-10 n.5.

12

Under Louisiana law, Sundowner -- not Chevron -- had the primary responsibility of providing its employees with a safe place to work, including safe equipment upon which to work and safe methods by which to work. See Kent v. Gulf States Utils. Co., 418 So.2d 493, 500 (La. 1982). Thus, even if Chevron could possibly have prevented this freak accident by employing additional safety measures, Chevron did not have a duty to Sundowner's employees who had to work on what turned out to be Sundowner's unsafe equipment. See, e.g., Ainsworth, supra. Chevron cannot be held liable when Chevron did not affirmatively create the hazardous situation by requiring Sundowner to use dangerous equipment or methods. See Kent, supra.

Those are the lessons of previous cases based on Louisiana law. If the majority's artful reconstruction of duties between principal and independent contractor's employees is adopted, however, those authorities become meaningless. One can hardly distinguish from this case a case in which a Chevron employee observed oil spilled on the decks or scaffolding hastily erected by the independent contractor. If Chevron allowed work to continue, would it not run afoul of the newly defined duty to provide a reasonably safe workplace? Such a result would fly in the face of the above-cited authorities.

To the extent the majority's holding is inconsistent with our previous decisions and with Louisiana tort law, it has little precedential force. I must respectfully dissent.

13