**Melvin A. GROSS and Edna Gross**

v.

**EXXON CORPORATION.**

No. 91–260–B.

United States District Court, M.D. Louisiana.

Nov. 3, 1994.

Arthur Ray Thomas, Thomas, Upshaw & Phillips, Baton Rouge, LA, for plaintiffs Melvin A. Gross, Edna Gross.

Stephen E. Broyles, Glusman, Moore, Arbour, Broyles & Glusman, Baton Rouge, LA, for intervenor-plaintiff Employers Nat. Ins.

John M. Roper, Exxon Co., USA, New Orleans, LA, for defendant Exxon Corp.

## OPINION

POLOZOLA, District Judge.

Melvin and Edna Gross filed this suit against Exxon Corporation ("Exxon") as a result of injuries Melvin Gross suffered when an electrical explosion occurred while he was

working at the defendant's refinery.[1] After reviewing the evidence, including the credibility of the witnesses who testified at the trial, the Court now issues its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The accident in this case occurred on December 29, 1989. At the time of the accident, Melvin Gross was married to Edna Gross and was employed by Harmony Construction Company ("Harmony"). In December, 1989, Gross approached Harmony for employment as an experienced electrician. He had previously worked approximately thirteen years on various jobs as an industrial electrician since completing a course of on-the-job and classroom training at Delgado Community College, New Orleans, Louisiana, in 1976.[2] Although not licensed as an electrician at the time of his accident, Gross had previously been licensed in Plaquemine Parish and Jefferson Parish, but had allowed those licenses to lapse.

Gross began working for Harmony on December 18, 1989. Prior to hiring Gross, Harmony had contracted with the defendant, Exxon, to do certain repair, construction, and maintenance work at Exxon's Baton Rouge Refinery located on Scenic Highway in Baton Rouge, Louisiana. The Harmony–Exxon contract called for Harmony to perform "Maintenance and Construction Work, including the furnishing of all labor, supervision, tools and equipment."[3] In fulfilling this obligation, Harmony represented to Exxon that Gross was a Class "A" electrician, a designation, which under Harmony's classification system, indicated Gross possessed the highest level of experience.[4]

Additionally, the contract required Exxon to supply Harmony with a written description of all work to be performed.[5] Despite this provision, there is no evidence that any written plans or specifications, other than the work permit, were furnished to Harmony regarding the work Gross was doing at the time he was injured.[6] The evidence does indicate that the job to be performed by the plaintiff was orally communicated to Gross by Don Breaux, an electrician employed by the defendant.[7] Also, pursuant to the contract, Roger Mullins, a Harmony employee, was assigned to act as foreman in the Central Mechanical Building ("CMB") where Gross was working at the time of the accident.[8] A Harmony supervisor, Ken Downey, was also present in the CMB from time to time and was involved in Gross being lined-out on the various jobs he was assigned while working at Exxon.[9]

On the evening of December 28, 1989, after Gross had finished converting a gate at the Exxon facility to motorized operation, Breaux gave Gross and his helper, Kirk Pastorick, directions about their next job assignment. Gross testified that Breaux instructed him to take down or disassemble a breaker and existing conduit and to run conduit from that breaker in order to add a second welding receptacle.[10] Breaux, on the other hand, testified that he merely told Gross to add another welding receptacle and that he did not mention anything about replacing or adding conduit.[11] Breaux also stated that although he did not tell Gross how to add an additional receptacle, he did not believe that running conduit would be involved in completing the job as he had described it to

1. Employers National Insurance Company, the workers' compensation insurer of Harmony Construction Company, filed a Complaint of Intervention seeking to recover benefits it paid to Melvin Gross as a result of the accident.

2. Tr. at 45.

3. Def.'s Ex. 1, Attach. A at 1.

4. Tr. at 45.

5. Def.'s Ex. 1, Art. 1 at 1.

6. The work permit stated, in part, "Work to be done/method: Run conduit as per the Instruction of Exxon." Pls.' Ex. 2 at 1.

7. Tr. at 21–22, 36 and 99.

8. Tr. at 130.

9. Tr. at 130.

10. Tr. at 23, 25–27, 29 and 33.

11. Tr. at 104, 126 and 129.

Gross.[12] Because it was late in the day, Gross and Pastorick were told to begin this next job on the following day.[13]

The next morning, Gross was met at the Exxon plant gate by Downey, who transported Gross and other members of the Harmony crew to the CMB. Upon arrival, Gross obtained conduit from an Exxon work area nearby and a ladder.[14] Then, according to Gross, he and Pastorick began to dismantle the existing circuit and conduit in preparation for installing an additional outlet as instructed by Breaux.[15]

The circuit breaker at which the existing circuit originated was contained in a metal box. The conduit through which the circuit ran to the welding receptacle terminated on the line side of that circuit breaker and remained energized even when the breaker was in the off position. The line side of the breaker was covered by a metal safety shield which was secured by several screws and remained in place even though the hinged lid of the breaker enclosure had been opened. With the safety shield in place, contact with the line side of the breaker was impossible.

Upon closer inspection of the work area, Gross testified that he could not install the receptacles according to the verbal instructions given by Breaux the evening before. He further stated that upon discovering that the existing conduit and conductors were improperly installed on the line side of the bus way instead of the load side, he descended from the ladder, found Breaux and informed him of the problem.[16]

Gross testified that during this conversation, Breaux told him that he had changed his mind and that he wanted Gross to install three outlets rather than two as originally lined-out. Breaux also allegedly indicated that if Gross had a problem doing what he was told, he would get someone else to do the job.[17] Breaux testified that he did not remember speaking with Gross on the morning of December 29, 1989, and also denied telling him that he would be replaced for not doing the job as he was instructed.[18] Based on the credibility of the witnesses, the Court believes that a conversation between Gross and Breaux did in fact occur, but that Breaux did not threaten Gross with losing his job.

After talking with Breaux, Gross proceeded back to the work area to install/replace the conduit with three outlets. Gross climbed the ladder and operated the breaker so as to de-energize the load side of the breaker, disconnected the three conductors for the existing circuit, taped their ends so that they would not make unintended contact with the energized line side of the breaker and then *forcibly* bent the safety shield so that he could work behind it.[19] Having forced the metal safety shield away from the energized line side of the breaker, Gross then reached into that area under the safety shield with hand tools to loosen the nut which was holding the original conduit to the breaker enclosure. During his attempt to remove the nut behind the metal safety shield, Gross made contact with the energized line side of the breaker, causing a phase-to-ground short. A substantial electrical explosion resulted which injured Gross.

Gross testified that when he forced the safety shield away from the line side of the breaker and attempted to work in close proximity therein, he was aware that the breaker was, in fact, energized.[20] He stated that he knew of the extreme danger of coming into contact with energized portions of the line side of the breaker.[21] He testified that although he did not know the location of the bus, he did not inquire into the procedure to disconnect or otherwise de-energize it because he thought Breaux had already done so. He testified that Breaux's attitude put

12. Tr. at 99–104.

13. Tr. at 124.

14. Tr. at 132.

15. Tr. at 28–29.

16. Tr. at 29–30.

17. Tr. at 29–30.

18. Tr. at 104, 127 and 130.

19. Tr. at 36–39 and 50–51.

20. Tr. at 65.

21. Tr. at 54.

him at ease.[22] He also maintained that Exxon did not instruct him on its "work hot," "tag out" or "lock out" procedures.[23]

Prior to beginning their work at the Exxon refinery, Gross and other Harmony employees attended a safety class session, which was required by Exxon, on December 19, 1989. After that session, Gross signed a Harmony form that indicated he had become fully acquainted with the appropriate Exxon safety standards, including Safety Standard # 157A entitled "Working in the Vicinity of High Voltage Electricity." That safety standard specifically forbids working on energized electrical circuits or near bare energized electrical circuits that could be first de-energized. Downey, the Harmony supervisor in the CMB, testified that he went over Exxon's Safety Standards # 157A & B with each worker who signed off on the checklist. Gross admitted that his signature does appear on the document indicating that he reviewed and understood the "Start-of-the-job-checklist," but testified that he believed his signature merely indicated that he had reviewed a safety film.[24] He maintains that he did not discuss or review other safety standards with Harmony or Exxon, including Safety Standards # 157A and B.[25]

## CONCLUSIONS OF LAW

Melvin and Edna Gross filed this suit against Exxon to recover damages which they incurred as a result of the explosion described above. The plaintiffs allege that Exxon is liable for their damages under Louisiana Civil Code Articles 2315, 2316, 2317, 2320 and 2322, as well as under the doctrine of res ipsa loquitur.

This case was properly removed to this Court from the Nineteenth Judicial District Court for the Parish of East Baton Rouge, Louisiana. There is complete diversity of citizenship existing between the parties and jurisdiction is proper under 28 U.S.C. 1332. Since this is a diversity case, the Court must apply the law of Louisiana in reaching its decision.

■ Article 2315 of the Louisiana Civil Code provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."[26] In addition, Article 2316 states that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."[27] Negligence is generally defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm.[28]

■ When determining "fault" as that term is used in the Louisiana Civil Code, Louisiana courts use the following three step duty-risk analysis:

(1) Was the defendant's conduct a cause-in-fact of the harm?

(2) Was a duty imposed on the defendant by a general rule of law to protect this plaintiff from this type of harm arising in this manner?

(3) Was that duty breached?[29]

Under Louisiana law, the existence of a duty and its scope are questions of law, while the question of whether that duty was breached is a question of fact.[30] Duties vary depending on the facts, circumstances, and context of each case and are limited by the particular risk, harm, and plaintiff involved.[31]

---

22. Tr. at 39–40 and 53–58.

23. Tr. at 16 and 39–40.

24. Tr. at 16 and 41.

25. Tr. at 60.

26. La.Civ.Code art. 2315.

27. La.Civ.Code art. 2316.

28. *Dobson v. Louisiana Power & Light Co.*, 567 So.2d 569 (La.1990).

29. *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 156–57 (5th Cir.1994).

30. *Dupre*, 20 F.3d at 157 (citing *Mundy v. Dep't of Health and Human Resources*, 620 So.2d 811, 813 (La.1993)).

31. *Dupre*, 20 F.3d at 157 (citing *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 239 (5th Cir.1983) and *Roberts v. Benoit*, 605 So.2d 1032 (La.1992)).

Plaintiff argues that the defendant's conduct was the sole cause of the plaintiff's injuries. However, the evidence indicates that Gross' own negligent conduct was chiefly responsible for the accident that occurred in this case. Gross testified that when he forced the safety shield away from the line side of the breaker and attempted to work in close proximity to the line side therein, he knew the breaker was, in fact, energized. He stated that as an experienced electrician, he knew of the extreme danger should he come in contact with energized portions of the line side of the breaker. Despite this knowledge and his experience as an electrician, Gross continued to work in a manner that subjected him to an unreasonable risk of harm. Upon consideration of all the evidence presented during the trial, the Court determines that Gross' conduct was the substantial cause of his injuries.

Notwithstanding the substantial negligence attributable to Gross, the Court also finds that Exxon's negligence was a cause of the plaintiff's injuries. As a general rule, "the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm."[32] The Fifth Circuit, in *Dupre v. Chevron U.S.A., Inc.*, recently held that this duty extends to employees of independent contractors, for whose benefit the owner must take reasonable steps to ensure a safe working environment.[33]

The *Dupre* Court stated that "[u]nlike the typical vicarious liability case in which the independent contractor created the danger," the case before it involved a scenario where the owner/operator of the facility specifically authorized the creation of a hazardous situation "when it expressly approved the independent contractor's plan for the installation and set-up of its rig."[34] Consequently, the Court in *Dupre* held that Chevron, as the owner/operator of a facility, had a duty to take reasonable steps to make and keep its platform safe for workers thereon and that this duty included areas of its platform altered or modified with its knowledge and approval.[35]

When Gross descended from the ladder, found Breaux and informed him that the existing conduit and conductors were improperly installed on the line side of the breaker instead of the load side, the defendant became aware of the dangerous situation that existed in the work area Gross was assigned. This conversation between Gross and Breaux was sufficient to notify the defendant that an independent contractor's employee was engaged in an unsafe practice on its premises. Nevertheless, Breaux did not seek to remedy the problem. Breaux's directive to make a three-pronged outlet rather than a two-pronged one, with no word of caution or command to avoid the dangerous breaker, is tantamount to an implied authorization or approval of an unsafe practice which implicates liability on behalf of the defendant.[36]

The Court also finds that Harmony, Gross' employer, was negligent for failing to properly supervise its employees as was its obligation under the Exxon–Harmony contract.[37]

In determining the percentage or degree of fault to be assigned to each party, the Louisiana Supreme Court, in *Watson v. State Farm Fire & Casualty Insurance*,[38] adopted the following five factors from the Uniform Comparative Fault Act as a checklist which may be relevant to such a determination:

32. *Dupre,* 20 F.3d at 157 (quoting *Mundy,* 620 So.2d at 813).

33. *Dupre,* 20 F.3d at 157.

34. *Dupre,* 20 F.3d at 157–58. Additionally, the *Dupre* Court noted that an earlier Fifth Circuit decision suggested that knowledge or the express or implied approval by the owner/operator of a facility of a dangerous situation implicated liability. *Dupre,* 20 F.3d at 158 n. 19.

35. *Dupre,* 20 F.3d at 158.

36. *See Dupre,* 20 F.3d at 158 n. 19; *Ham v. Pennzoil Co.,* 869 F.2d 840, 842 (5th Cir.1989).

37. Def.'s Ex. 1, Art. 2 at 1.

38. 469 So.2d 967 (La.1985).

(1) Whether the conduct was mere inadvertence or engaged in with an awareness of the danger involved;

(2) The magnitude of the risk created by the conduct, including the number of persons endangered and the potential seriousness of the injury;

(3) The significance of what the actor was seeking to attain by this conduct;

(4) The actor's superior or inferior capacities; and

(5) The particular circumstances, such as the existence of an emergency requiring a hasty decision.[39]

 Therefore, with these factors considered and after weighing all the evidence presented at trial, including the credibility of the witnesses, the Court finds that the majority of the fault must rest with the plaintiff. The causal relationship between Gross' negligent conduct and his injury is a direct one. On the other hand, although Exxon and Harmony's conduct contributed to the plaintiff's injuries, their negligence was not as directly related to Gross' injuries as was the conduct of Gross himself. Therefore, the Court apportions the fault in this case as follows:

Gross 90%

Exxon 5%

Harmony 5%

 Because Harmony is an employer which is statutorily immune from damage liability, and its fault also contributed to Gross' injury, the Court must follow the rationale and formula set forth in *Prestenbach v. Rains*[40] in apportioning fault under Louisiana's comparative fault scheme. Under *Prestenbach,* the ratio of fault between Gross and Exxon is 90:5. Thus, the parties' relative allocation of fault according to the ratio approach is:

Exxon 5.26%.

Gross 94.74%

Therefore:

**39.** *Watson,* 469 So.2d at 974.

**40.** 4 F.3d 358 (5th Cir.1993) (relying on *Gauthier v. O'Brien,* 618 So.2d 825 (La.1993)).

**41.** In their petition, the plaintiffs also set forth that Exxon is strictly liable under Louisiana Civil

**IT IS ORDERED** that the parties have 20 days to advise the Court whether they wish to proceed to the damage phase of the trial at this time or have the Court enter a final judgment under Rule 54(b) of the Federal Rules of Civil Procedure.[41]

Code Articles 2317, 2320 and 2322, as well as liable under the doctrine of res ipsa loquitur. However, because the Court determines that these theories of recovery are unfounded, the Court will not address the issues raised by these arguments.