860 F.2d 639
 William E. GRAMMER, Plaintiff-Appellee,
Insurance Company of North America and Boco of Lafayette,
Inc., Intervenors- Appellees,
and Home Indemnity Company, Intervenor-Appellee,
v.
PATTERSON SERVICES, INC., Defendant-Third Party Plaintiff-Appellant,
v.
GATOR HAWK, INC., Defendant-Appellee,
Home Insurance Company, Third Party Defendant-Appellant.
 No. 88-4115.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 23, 1988.
Rehearing Denied Dec. 29, 1988.
 
 Joseph Waitz, Houma, La., for Patterson Services, Inc.
 James H. Gibson, Lafayette, La., for Home Ins. Co.
 Bob F. Wright, Philip S. Aucoin, Jr., Lafayette La., for Grammer.
 Steven B. Rabalais, Lafayette, La., for Ins. Co. of North America.
 James H. Gibson, Lafayette, La., for Home Indem. Co. and Gator Hawk, Inc.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before THORNBERRY, RUBIN, and HIGGINBOTHAM, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 In this dispute involving a principal's liability for the activities of its independent contractor, defendant-appellant Patterson Services, Inc. (Patterson) appeals the district court's judgment based upon a jury verdict. Also on appeal, third-party defendant-appellant Home Insurance Company attacks that part of the judgment granting intervenors Boco of Lafayette, Inc. (Boco) and Insurance Company of North America the right of contribution for one-half of all worker's compensation benefits and medical expenses paid or to be paid to plaintiff-appellee William Grammer. We reverse the judgment insofar as it imposes liability on Patterson and affirm that part of the judgment entitling Boco and Insurance Company of North America to partial contribution.
 
 I. Background
 A. Facts
 
 2
 Patterson is in the business of leasing oilfield pipeline to drillers. Before delivering pipe to lessees, Patterson tests each joint (piece) to ensure it can withstand the anticipated pressures encountered while conducting downhole drilling operations. Not in the business of pipe testing itself, Patterson contracts with independent contractors to conduct such inspections. During the period pertinent to our review, Patterson had entered into a lease agreement with Gator Hawk, Inc. (Gator Hawk) by which Gator Hawk agreed to bring its Automatic Hydrostatic Internal Tester (the AHIT machine) to Patterson's yard in Morgan City, Louisiana where Gator Hawk crews would conduct the testing procedure. Although remaining in possession of the AHIT machine, Gator Hawk agreed to travel to Morgan City at Patterson's request to operate and maintain the machine and "to provide such labor, supplies and other services ... as may be required by Lessee from time to time." Pl. Ex. No. 2, p. 2.
 
 
 3
 Mr. Grammer was an employee of Boco, a company that furnished labor crews for hire. Typically, when Patterson needed pipe tested, Gator Hawk hired laborers from Boco to assist the Gator Hawk machine operator. In response to Patterson's request to conduct pipe testing on November 4th and 5th, 1981, Gator Hawk provided a three man crew consisting of its own operator, Donnie Castille, and two Boco laborers one of whom was Mr. Grammer. While conducting hydrostatic testing on November 5, 1981, a joint of pipe ruptured in the AHIT machine. The ruptured pipe discharged highly pressurized fluid that struck Grammer's face and catapulted him some distance. Mr. Grammer sustained injuries from this incident.
 
 
 4
 Mr. Grammer brought this tort action against Gator Hawk and Patterson in the United States District Court for the Western District of Louisiana alleging theories of strict liability and general negligence. The district court granted summary judgment for Gator Hawk holding it immune from the tort action and limiting its liability as a "statutory employer" to worker's compensation benefits and medical expenses. The court granted Patterson's motion for directed verdict on the issue of strict liability, but denied the motion as it related to the general negligence claim. The district court submitted the issue of Patterson's negligence to the jury which returned a verdict in favor of Mr. Grammer. Grammer was awarded $570,000 in damages, less ten percent attributable to his own contributory negligence.
 
 B. Applicable Law
 
 5
 Under Louisiana law governing this diversity case, the well settled general rule is that a principal is not liable for the offenses of its independent contractor committed while performing duties under a contract. Bartholomew v. CNG Producing Co., 832 F.2d 326, 329 (5th Cir.1987); Ainsworth v. Shell Offshore, Inc., 829 F.2d 548, 549 (5th Cir.1987); Hawkins v. Evans Cooperage Co., Inc., 766 F.2d 904, 906 (5th Cir.1985); Wallace v. Oceaneering Int'l, 727 F.2d 427, 437 (5th Cir.1984). Equally well settled are the two exceptions to this general rule. First, a principal cannot escape liability for injuries resulting from an ultrahazardous activity by hiring out the work to an independent contractor. On appeal, Grammer has not challenged the district court's determination that hydrostatic pipe testing does not constitute an ultrahazardous activity; therefore, we need not address this exception. Under the second exception, a principal may be liable for the acts of its independent contractor "over which it has exercised operational control or which it has expressly or impliedly authorized." Hawkins, 766 F.2d at 906.
 
 
 6
 Guided by the second exception, the district court instructed the jury that if it found Patterson had exercised operational control over the pipe testing procedure, Patterson would have owed Grammer a duty of care, the breach of which would form the basis of liability under Louisiana's general negligence statute. La.Civ.Code Ann. art. 2315 (West Supp.1988). On appeal, Patterson advances two arguments challenging the propriety of the jury instruction as it pertained to the issue of operational control. First, Patterson asserts the district court's directed verdict dismissing Grammer's strict liability claim should have disposed of the negligence claim. Second, Patterson argues the evidence adduced at trial is insufficient as a matter of law to establish a jury question on the issue of operational control.
 
 II. Dismissal of the Strict Liability Claim
 
 7
 At trial, Grammer first asserted a theory for recovery based on Louisiana's strict liability statute which imposes liability on persons for "the damage occasioned by ... the things we have in our custody." La.Civ.Code Ann. art. 2317 (West 1979). " 'Custody' in this article means supervision and control." Ainsworth, 829 F.2d at 551 (citing Steele v. Helmerich & Payne Int'l Drilling Co., 738 F.2d 703, 707 (5th Cir.1984) and Colleps v. State Farm Gen. Ins. Co., 446 So.2d 988 (La.Ct.App.1984)). Finding no evidence that Gator Hawk turned over the control, operation, or possession of the AHIT machine to Patterson, the district court concluded that the AHIT machine was not in Patterson's custody and therefore granted Patterson's motion for directed verdict on Grammer's strict liability claim.
 
 
 8
 Patterson contends that once the district court found Patterson lacked custody or "supervision and control" over the AHIT machine, it was error to instruct the jury on the issue of operational control. Essentially Patterson argues "supervision and control" under article 2317 is synonymous with "operational control." We reject this purely semantic argument.
 
 
 9
 "Supervision and control" arises in a context wholly unrelated to that involving operational control. The term "supervision and control" represents a judicial reformulation of the term "custody" which appears in article 2317. This article imposes strict liability on persons having custody or "supervision and control" over things which cause damage. By contrast, operational control, as discussed more fully below, refers to control over the manner and method of operating things. While one person may simultaneously control and supervise the thing itself and control the operation of the thing, we find these responsibilities distinct and their occasional confluence merely fortuitous. With this finding, we conclude that the district court's directed verdict in Patterson's favor on the strict liability claim did not vitiate the general negligence claim.
 
 
 10
 III. Sufficiency of the Evidence Regarding Operational Control
 
 A. Standard of Review
 
 11
 Patterson's primary argument on appeal is that the evidence presented at trial was insufficient as a matter of law to engender a jury question on the issue of Patterson's operational control over the pipe testing procedure. Therefore, Patterson contends, the district court erred in denying its motions for directed verdict and judgment notwithstanding the verdict. The motion for judgment notwithstanding the verdict was properly before the district court since Patterson's motion for directed verdict on the same ground had been denied. Fed.R.Civ.P. 50(b); Hinojosa v. City of Terrell, Texas, 834 F.2d 1223, 1227-28 (5th Cir.1988).
 
 
 12
 Our review of evidentiary sufficiency is governed by the well established standard in this Circuit:
 
 
 13
 On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence--not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury.
 
 
 14
 Boeing v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc); McCormack v. Noble Drilling Corp., 608 F.2d 169, 171-72 (5th Cir.1979); Hawkins, 766 F.2d at 907. Applying the Boeing standard, we hold the evidence on operational control insufficient to create a jury question and find error in the district court's refusal to grant Patterson's motion for judgment notwithstanding the verdict on this claim.
 
 B. Patterson's Instructions
 
 15
 Grammer asserts that certain instructions given by Patterson to Gator Hawk constituted operational control over the pipe testing procedure. Whether Patterson's instructions constituted operational control requires an understanding of the testing procedure and the specific context in which the instructions were given.
 
 
 16
 Each pipe joint consisted of a male and female end; both male and female ends had three threads or seals that, during downhole drilling, were screwed into other pipe ends to create a string of pipe. The objective of the testing procedure was to ensure that (1) the seals were strong enough to withstand the weight of the pipe string and (2) the body of the pipe could withstand anticipated downhole pressures. Gator Hawk's AHIT machine was designed to test both pipe seals (threads) and body.
 
 
 17
 As mentioned, Gator Hawk retained possession of the AHIT machine despite having leased it to Patterson, and, at Patterson's request, transported the AHIT machine to Patterson's yard in Morgan City where Gator Hawk examined the pipe. Donnie Castille, Gator Hawk's operator of the AHIT machine, testified that the standard testing routine occurred as follows: After placing the AHIT machine next to a stack of pipe to be tested, the arms of the machine would automatically roll a joint of pipe into position on the machine. Plugs on each end of the thirty foot machine would screw onto the ends of the pipe and, in doing so, engage the pipe's outermost or primary seal. Only ten percent of the pipe's maximum torque make up was required for the plug to engage the pipe's primary seal. In this case, since the particular type of pipe was able to withstand torque of approximately three thousand foot-pounds, Gator Hawk normally torqued the plugs ten percent or up to three hundred foot-pounds. "Torque" as used here simply refers to the measure of force used to screw the plugs onto the pipe ends. The greater the torque, the tighter the plug-pipe connection.
 
 
 18
 Once the AHIT machine tightened its plugs onto the pipe ends, the machine operator gradually injected highly pressurized water into the body of the pipe. After approximately twenty seconds, the water pressure reached the recommended testing level of 18,000 pounds per square inch (psi) at which time the operator held the pressure constant for an additional five seconds. The pipe failed the inspection if either (1) the body or walls of the pipe ruptured under the stress of the water pressure, or (2) the primary seal failed to contain the pressurized water. If the latter occurred, water leaking from the primary seal would escape from a valve in the plug called a "weephole." After holding the pressure constant at 18,000 psi for five seconds, the operator slowly released the pressure. The AHIT machine, if functioning properly, would then automatically unscrew its plugs from the pipe and prepare to roll the next piece into testing position.
 
 
 19
 Some months before Grammer's injury, a Gator Hawk testing session of Patterson's pipe resulted in a particularly high rejection rate due to faulty primary seals. It was at this time that, upon questioning the machine operation, Patterson first learned about the AHIT machine's technical operations including the standard practice of torquing the plugs only to the extent necessary to engage the primary seal. To improve their pass rate, Patterson instructed Donnie Castille, the operator, to maximize the AHIT machine's torque which had the effect of tightening the plugs onto the pipe ends to a greater degree thereby engaging the second and third seals in addition to the primary seal. The escape valves or weepholes in the plugs rendered it physically impossible to torque the plugs beyond the primary seal; therefore, Patterson instructed Gator Hawk to remove the weepholes so the AHIT machine's maximum torque could be utilized.
 
 
 20
 Although hotly contested by the parties, the reason underlying Patterson's request to maximize torque seems clear. Patterson needed to devise a test less stringent than Gator Hawk's normal procedure so that more of its pipe would pass the test. By maximizing torque and engaging all three seals, defects in the primary seal were less likely to surface; consequently, more pipe passed the inspection leaving Patterson with a larger leasable inventory.
 
 
 21
 On November 4th and 5th, 1981, Patterson's pipe tested extremely poorly. Based on the instructions given months before, Donnie Castille began torquing the AHIT machine's plugs beyond the pipe's primary seals. Because the plugs were connected so tightly to the pipe ends, the AHIT machine was unable to automatically disengage the plugs after the joint had been tested. Donnie Castille instructed Grammer to assist the disengaging process by placing a wrench on the pipe to secure it while the machine "backed off" the plugs. On November 5th, Grammer approached the AHIT machine to apply the wrench a few seconds before the water pressure had been released. The pipe ruptured spewing highly pressurized water into Grammer's face.
 
 
 22
 On appeal, Grammer's sole assertion is that Patterson's instructions to torque the AHIT machine to its maximum and to remove the plugs' weepholes to accomplish maximum torque rose to the level of operational control over the testing procedure.
 
 
 23
 The term "operational control" as employed by this Circuit and Louisiana courts can be traced to the Restatement which provides in part that "[i]f the employer of an independent contractor retains control over the operative detail of doing any part of the work," he may be subject to liability for the offenses of his independent contractor. Restatement (Second) of Torts Sec. 414 comment a (1965) (emphasis added). Section 414 further provides that
 
 
 24
 [i]n order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.
 
 
 25
 Id., comment c (emphasis added). Following Sec. 414 we have consistently held that operational control does not arise unless the principal retains control over the methods and manner of performing the work. Wallace, 727 F.2d at 437 (indicating that the central issue germane to operational control is control over the manner of performance); see Hawkins, 766 F.2d at 908 (finding no operational control where principal failed to instruct the method of transport). A recent Louisiana case intimated that operational control only arises if the principal "exercise[s] direct supervision over the step-by-step process of accomplishing the work." Guillory v. Conoco, Inc., 521 So.2d 1220, 1223 (La.Ct.App.1988). After reviewing all the evidence, we conclude that Patterson's instructions to maximize torque and remove weepholes did not constitute operational control over the testing. Rather, these instructions were merely designed to prescribe alterations in the type of test ordinarily conducted by Gator Hawk.
 
 
 26
 As mentioned, only instructions designating "how to" conduct operations merit application of the operational control exception. Subject to an operative contract, it is wholly within the principal's province to specify that which an independent contractor is to accomplish. Viewing Patterson's instructions in light of all the evidence, it is clear Patterson simply wanted Gator Hawk to conduct a less stringent test to remedy the high rejection rate. It is unlikely Patterson intended to substitute its own lack of experience in conducting dangerous pipe testing for Gator Hawk's expertise.
 
 
 27
 We realize that, if viewed completely detached from the appropriate context, Patterson's instructions may be construed as designating "how to" conduct the testing. However, in view of Patterson's need to devise a less stringent test and its apparent lack of experience in hydrostatically testing pipe, the instruction to maximize torque seems no more than its way of articulating alterations in Gator Hawk's normal test. Had Patterson employed language that simply designated the desired test--such as "test all three seals"--instead of its instruction to "maximize torque," we doubt an issue of operational control would have arisen. Having found that Grammer's claim largely hinges on the dubious distinction between an instruction to "maximize torque" and one to "test all three seals," we decline to impose liability for a mere hapless use of language.
 
 
 28
 Citing this court's decision in Wallace, Grammer insists that Patterson's instructions prohibited Gator Hawk from being "entirely free to do the work in his own way" and thereby rose to the level of operational control. We disagree. Certainly, Gator Hawk was not free to do any work it wished. Patterson's instructions expressly designated a new, possibly substandard test which reflected a variation in Gator Hawk's normal test. Gator Hawk was bound by the lease agreement to perform this additional service. However, Gator Hawk was free to, and did, conduct the testing in its own way. No evidence suggests Patterson designated how the Gator Hawk crew was to stack the pipe, inject water pressure, retain water pressure, or engage and disengage pipe from the AHIT machine. Rather, it is uncontroverted that Gator Hawk's Donnie Castille instructed Grammer on all matters including the use of the wrench to loosen the plugs from the pipe ends.
 
 
 29
 The evidence overwhelmingly indicates that Patterson personnel participated to a very limited extent in the testing procedure. Michael Kern, the Patterson yard dispatcher, testified that Patterson personnel had been instructed to stay away from the testing area because it was a dangerous procedure about which his men knew nothing. Donnie Castille testified that only he operated the machine and that "there were no Patterson hands working on this machine." The record is entirely devoid of any suggestion that Gator Hawk informed Patterson that the AHIT machine was unable to automatically disengage its plugs from the pipe ends or that Patterson knew the Gator Hawk crew was assisting this process by use of a hand held wrench. Thus, although not specifically raised by Grammer on appeal, this evidence nullifies any implicit contention that Patterson "expressly or impliedly authorized" or was aware of the dangerous activity.
 
 
 30
 Instructions which appear to impose operational control over a contractor's activities are at times more appropriately characterized as a principal's shorthand way of designating a desired outcome. Language itself is not dispositive. Rather, such instructions must be analyzed in the context in which they are imparted. Having viewed the evidence as a whole, we conclude that Patterson's directions merely designated the type of test to be conducted rather than the method to conduct it. As a matter of law, the instructions did not constitute operational control over the testing procedure. We hold that the district court erred in denying Patterson's motion for judgment notwithstanding the verdict on the issue of operation control.
 
 IV. Claim for Contribution
 
 31
 Boco and its compensation carrier Insurance Company of North America (INA) intervened in this action to recover medical expenses and worker's compensation benefits paid and to be paid to Mr. Grammer. This complaint, originally naming Gator Hawk and Patterson as defendants, was ultimately amended to include Gator Hawk's compensation carrier Home Insurance Company (Home). Due to Gator Hawk's bankruptcy proceedings and our reversal of the judgment against Patterson, the sole remaining defendant in this intervention action is Home.
 
 
 32
 The district court, by way of summary judgment, concluded that Gator Hawk was Grammer's "borrowed employer" and that its insurer Home was liable for one-half of all medical expenses and worker's compensation benefits paid and to be paid to Grammer. On appeal, Home apparently concedes Gator Hawk's status as a "borrowing employer" but argues Boco and INA's claim for contribution prescribed.
 
 
 33
 Home asserts that the prescription period governing a claim for contribution is based upon the underlying obligation binding the parties. Home's sole argument is that, since an action instituted by Grammer for compensation benefits would be governed by section 1209 of Louisiana Worker's Compensation Act, section 1209 controls Boco and INA's claim for contribution as well. Section 1209 provides in part:
 
 
 34
 In case of personal injury, including death resulting therefrom, all claims for payments shall be forever barred unless within one year after the accident or death the parties have agreed upon the payments to be made under this Chapter, or unless within one year after the accident a formal claim has been filed with the office as provided in this Chapter. Where such payments have been made in any case, the limitation shall not take effect until the expiration of one year from the time of making the last payment ....
 
 
 35
 La.Rev.Stat.Ann. Sec. 23:1209 (West 1985) (emphasis added). We express doubt that section 1209 governs contribution claims for worker's compensation payment, see Employer's Liab. Assurance Corp., Ltd. v. Gen. Accident Fire and Life Assurance Corp., Ltd., 125 So.2d 689, 692-93 (La.Ct.App.1960) (holding that a claim by an insurer against another insurer to recover worker's compensation payments is a claim for restitution governed by a ten year prescription period), but that issue need not be resolved at this juncture. Assuming arguendo that section 1209 applies as Home contends, we hold that Boco and INA's claim did not prescribe.
 
 
 36
 It is uncontested that Boco and INA made payments for Grammer's medical expenses and worker's compensation benefits from the date of his injury to the date of trial. Nevertheless, Home argues that since Boco and INA brought the claim for contribution more than one year after instituting such payments, section 1209 prescribes their claim. We find this argument meritless. Section 1209 clearly states that if payments are made, the prescription period will not commence until payments cease. Because Boco and INA continued to pay benefits, the event triggering the commencement of the section 1209's prescription period never occurred.
 
 V. Conclusion
 
 37
 For the foregoing reasons, we REVERSE the district court's judgment against Patterson Services, Inc. and AFFIRM the judgment against Home Insurance Co.