# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 28, 2017

Lyle W. Cayce
Clerk

No. 16-20611

MARITES VOCES, Individually and on behalf of the Estate of Peter Jorge Voces, Deceased, & A/N/F J.V., M.V., M.P.V. and P.V., Minor Children

> Plaintiff - Appellant

v.

ENERGY RESOURCE TECHNOLOGY, G.O.M., L.L.C.; TALOS ENERGY, L.L.C.,

> Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:14-CV-525

Before KING, PRADO, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Defendant–Appellee Energy Resource Technology GOM, L.L.C. hired an independent contractor to remove one of its oil and gas platforms located on the outer continental shelf off the coast of Louisiana. During the removal, Peter Voces, a welder employed by the independent contractor, was killed. Mr. Voces's wife, Plaintiff–Appellant Marites Voces, individually and on behalf of

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-20611

Mr. Voces's estate and their four minor children, sued Defendants–Appellees, asserting that they were vicariously liable for the independent contractor's negligent acts and independently liable for their own negligent acts. The district court granted Defendants–Appellees' motion for summary judgment and denied Plaintiff–Appellant's motion for reconsideration. We AFFIRM.

## I. FACTS AND PROCEDURE

### A. Factual Background

Peter Voces was a welder employed by Offshore Specialty Fabricators, L.L.C. (OSF), a company specializing in the removal of decommissioned oil and gas platforms in the Gulf of Mexico. On May 30, 2013, Defendant–Appellee Energy Resource Technology GOM, L.L.C. (ERT) awarded OSF a contract to remove ERT's decommissioned Vermillion 200A oil and gas platform (the Contract).[1] The Contract was for a lump sum of $4,316,235 and consisted of several related documents. The Contract provided that OSF would perform all work as an independent contractor and that OSF was responsible for providing all necessary services, equipment, materials, personnel, and engineering to safely remove the Vermillion 200A. Specifically, the Contract provided that OSF's duties and responsibilities included (1) establishing written operating procedures to ensure safe working conditions; (2) performing all work in accordance with the operating procedures; (3) periodically reviewing the operating procedures to ensure they reflect actual operating conditions; and (4) performing work only with personnel trained to do so in a safe manner.

OSF developed its operating procedures for removing the Vermillion 200A (the Work Plan). An ERT company man[2] and an ERT platform engineer

---

[1] ERT is a subsidiary of Defendant–Appellee Talos Energy, L.L.C. (Talos). Plaintiff does not challenge Talos's assertions that she sued Talos in name only and has not prosecuted any cause of action against Talos. Accordingly, this opinion does not separately address the claims Plaintiff nominally asserted against Talos.

[2] A "company man" is an on-site representative of an oil and gas company.

both reviewed the Work Plan, primarily to ensure OSF understood the scope of the work under the Contract. Under the Work Plan, the first components of the Vermillion 200A to be removed were two 83-foot flare booms that were attached to the top of, and extended out over the Gulf of Mexico from, a cylindrical dry oil tank, known as ABJ-332 tank, which was connected to the edge of the platform by several rectangular steel pads. After the flare booms were removed, the Work Plan provided that the ABJ-332 tank would be removed. The Work Plan, however, expressly provided that its procedures were "subject to change for offshore environment"; that the OSF's barge superintendent would "determine the final procedure based on actual site requirements"; and that ERT's company man would "be informed of any changes." As the Work Plan suggested, OSF's barge superintendent was in charge of all platform removal activities, while the primary role of ERT's company man was monitoring OSF's work for compliance with the Contract.

On the evening of October 26, 2013, OSF's derrick barge (with ERT's company man on board) arrived at the Vermillion 200A to begin the removal process. Based on the weather forecast, OSF's barge superintendent decided to delay heavy lifts, including removal of the flare booms connected to the ABJ-332 tank, until the weather improved. He then "notified" ERT's company man of his intention to delay any heavy lifts as "[p]art of [their] conversation of talking about the work." OSF's barge superintendent nonetheless decided it was safe to start "prep work" for the Vermillion 200A removal, including cutting the skid pads connecting the ABJ-332 tank to the platform.

OSF's crew was divided into two shifts, a day and night shift, to accomplish the removal prep work. In conducting prep work, it was OSF's policy not to cut more than 50% of pad welds connecting heavy equipment to the platform unless that equipment was hooked up to, and supported by, the derrick barge's crane (the 50% Rule). OSF's welding foremen were responsible

for ensuring the 50% Rule was followed, and OSF's barge superintendent told ERT's company man the 50% Rule would be observed.

The prep work commenced early on October 27. At the mid-day shift change, the welding foremen for the day and night shifts discussed the prep work. There is conflicting testimony as to whether they discussed how many or how much of the pad welds securing the ABJ-332 tank to the platform had been cut. According to the welding foreman for the day shift, he was not told that the night shift had already cut on the ABJ-332 tank's pad welds. After the shift change, OSF's welders continued cutting the ABJ-332 tank's pad welds. At approximately 4 p.m., several workers heard a loud pop from the vicinity of the ABJ-332 tank, which one welder attributed to a weld on one side of the tank breaking. OSF's welding foreman heard the pop, but did not order the prep work stopped or notify ERT's company man about the noise. About an hour later, Mr. Voces cut the catwalk that connected the ABJ-332 tank to adjoining equipment. With no pad welds left securing the ABJ-332 tank to the platform, the ABJ-332 tank rotated off the platform into the Gulf of Mexico, carrying Mr. Voces with it and resulting in his drowning.

Following Mr. Voces's death, the Bureau of Safety and Environmental Enforcement (BSEE) conducted a panel investigation.[3] The panel recommended that the BSEE consider issuing ERT an "Incident of Non-Compliance" (INC) for failing to perform operations in a safe and workmanlike manner, as required by 30 C.F.R. § 250.107(a).[4] Following the panel's recommendation, the BSEE issued ERT a Notification of INC under 30 C.F.R. § 250.107(a) on November 13, 2014, citing (1) the ERT platform engineer's

---

[3] The BSEE is the lead agency under the Department of Interior in charge of ensuring safety and environmental protection for offshore oil and gas production.

[4] 30 C.F.R. § 250.107(a) provides that a lessee or its designated operator under an offshore mineral lease "must protect health, safety, property, and the environment by," *inter alia*, "[p]erforming all operations in a safe and workmanlike manner."

acceptance of OSF's bid without further engineering verification of the Work Plan[5] and (2) the failure of ERT's company man to recognize or question OSF's non-compliance with OSF's safety policies during the prep work, which ERT understands as a reference to the 50% Rule.

On November 25, ERT responded to the Notification of INC via letter, asserting that (1) the Work Plan created by OSF was safe and (2) ERT's company man did not know and should not have known that OSF was not following OSF's safety policies. In part, the letter stated:

> As the representative of the operator charged with oversight of [OSF's] removal of [the Vermillion 200A], [ERT's company man's] responsibility was to ensure that OSF's work plan was safe and that the work plan had been properly communicated to all OSF employees. The work plan presented to [ERT's company man] was safe, as it included a safe plan for the removal of the vent booms and the inclusion of the 50% cut limit. It is also undisputable that, as far as [ERT's company man] could possibly have known, OSF had properly communicated the work plan to all of its employees, which OSF confirmed to [ERT's company man].

ERT's appeal to the BSEE has not been resolved and no civil penalty has been issued.

## B. Procedural Background

Plaintiff–Appellant Marites Voces, individually and on behalf of Mr. Voces's estate and their four minor children (Plaintiff), sued ERT in federal district court on March 3, 2014, asserting several causes of action under Louisiana law (as surrogate to federal law under the Outer Continental Shelf Lands Act).[6] Specifically, Plaintiff claimed ERT was (1) vicariously liable for

---

[5] The platform engineer performed a "very rough" calculation of "weight take off on the jacket"—the legs that support the Vermillion 200A below the surface—and, based on that calculation, requested that OSF have an independent structural engineering analysis conducted.

[6] The Outer Continental Shelf Lands Act mandates that when disputes arise involving fixed structures erected on the outer continental shelf, the applicable laws of the adjacent state will be applied to the extent not inconsistent with other federal laws and regulations.

No. 16-20611

the negligence of its contractor, OSF, and (2) independently liable for its own negligence (i.e., ERT was liable for Mr. Voces's death due to its breach of independent duties owed to Mr. Voces).[7]

ERT moved for summary judgment as to all claims asserted by Plaintiff. On February 18, 2016, the district court granted ERT's motion for summary judgment on all of Plaintiff's claims, without directly addressing Plaintiff's claim arising from ERT's alleged independent negligence. Plaintiff timely moved for reconsideration, arguing that factual issues precluded summary judgment on both her independent negligence claim and her vicarious liability claim. The district court denied that motion and supplemented its original order. Plaintiff timely appeals.

## II.  STANDARDS OF REVIEW

"We generally review a decision on a motion to alter or amend judgment under Rule 59(e) for abuse of discretion." *Pioneer Nat. Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Local 4–487*, 328 F.3d 818, 820 (5th Cir. 2003). However, the standard of review is de novo where the ruling seeks reconsideration of a question of law. *Id.* We likewise review the grant of summary judgment de novo. *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (per curiam). A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if a reasonable jury could enter a verdict

---

43 U.S.C. § 1333(a)(1); *see also Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355 (1969) ("The [Outer Continental Shelf] Lands Act makes it clear that federal law, supplemented by state law of the adjacent State, is to be applied to these artificial islands as though they were federal enclaves in an upland State."). Thus, Louisiana law applies here.

[7] Plaintiffs also asserted that ERT was liable under a theory of strict premises liability. The district court granted summary judgment on that claim, and Plaintiff does not challenge that ruling on appeal.

for the non-moving party." *Kemp*, 610 F.3d at 234 (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citation omitted)). We view the facts and evidence in the light most favorable to the non-moving party. *Id.*

## III. LIABILITY

The Contract provided, and Plaintiff does not dispute, that ERT and OSF had a principal/independent contractor relationship, as opposed to a master/servant relationship. "Louisiana law provides the general rule that a principal is not liable for the negligent acts of an independent contractor acting pursuant to the contract." *Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir. 1994). There are exceptions to the general rule against vicarious liability, however, including when the principal retains or exercises "operational control over [the independent contractor's] acts or expressly or impliedly authorizes an unsafe practice" (the operational control exception).[8] *Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 329 (5th Cir. 1987). "Further . . . , the principal remains liable for its own acts of negligence." *Graham*, 21 F.3d at 645. Here, Plaintiff argues that the district court erred in granting summary judgment

---

[8] ERT argues that the express or implied authorization language in this statement of the operational control exception (and countless others) is merely surplusage. According to ERT, the express or implied authorization language is rooted in a previous exception for inherently dangerous activities, which the Louisiana Supreme Court rejected in *Kent v. Gulf States Utilities Co.*, 418 So. 2d 493 (La. 1982), and this court rejected in *Roberts v. Cardinal Services, Inc.*, 266 F.3d 368 (5th Cir. 2001). While ERT's proposed etymology is not without some support, *see* Ben Perkowski, Jr., *The Employee and the Torts of His Independent Contractor in Louisiana*, 21 Tul. L. Rev. 619, 627 (1947); *see also Massey v. Century Ready Mix. Corp.*, 552 So. 2d 565, 574–76 (La. Ct. App. 1989); *Guillory v. Conoco Inc.*, 521 So. 2d 1220, 1224 (La. Ct. App. 1988), neither *Kent* nor *Roberts* directly addresses, much less rejects, express or implied authorization of an independent contractor's negligent act as a viable means for establishing a principal's vicarious liability. Indeed, this court (and Louisiana courts) have consistently looked for express or implied authorization as a means of establishing such liability, even following both decisions. *See, e.g., Davis v. Dynamic Offshore Res., L.L.C.*, --- F.3d ---, 2017 WL 1958950, *2 (5th Cir. 2017); *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003). We are bound by these prior decisions as to the meaning of Louisiana law. *See Welborn v. State Farm Mut. Auto. Ins. Co.*, 480 F.3d 685, 687 (5th Cir. 2007) (per curiam).

because she raised genuine issues of material fact both as to ERT's vicarious liability under the operational control exception and as to its independent negligence. We address each argument in turn.

## A. Vicarious Liability

Plaintiff argues that the district court erred in granting summary judgment on her vicarious liability claim because she offered evidence raising genuine issues of material fact regarding both ERT's operational control over OSF's acts and ERT's express or implied authorization of OSF's unsafe practice. We disagree.

### 1. Operational Control

Determining operational control "depends in great measure upon whether and to what degree the right to control the work has been contractually reserved by the principal." *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987) (quoting *Hemphill v. State Farm Ins. Co.*, 472 So. 2d 320, 322 (La. Ct. App. 1985)). Whether and to what degree control "is *actually* exercised by the principal is less significant." *Id.* at 550–51 (quoting *Hemphill*, 472 So. 2d at 322). "Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way." *Fruge*, 337 F.3d at 564.

A principal may demand in its contract that an independent contractor develop safe work procedures without triggering the operational control exception. *See LeJeune v. Shell Oil Co.*, 950 F.2d 267, 269–70 (5th Cir. 1992) (recognizing a contractual clause requiring a contractor to comply with the owner's safety rules was insufficient to show operational control). And a principal may monitor its independent contractor's work for compliance with contractual demands without triggering the operational control exception. *See Dauzat v. Thompson Constr. Co.*, 839 So. 2d 319, 322 (La. Ct. App. 2003)

No. 16-20611

("Approving the plans and inspecting for compliance with the specifications does not establish such control that would result in its liability."); *Nippa v. Chevron, USA*, 774 So. 2d 310, 315 (La. Ct. App. 2000) ("[A principal] is entitled to supervise its independent contractors to the extent necessary to insure compliance with the terms of the contract."). Thus, the mere facts that a principal takes an interest in the safety of the employees of its independent contractors and stations a company man on an oil platform do not, in and of themselves, constitute operational control. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 193 (5th Cir. 1991); *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997).

Here, as previously detailed, the Contract expressly vests OSF, not ERT, with responsibility for developing the procedures to ensure safe working conditions during the removal of the Vermillion 200A. Further, it expressly provides that "[OSF] conclusively shall be deemed an independent contractor, with the authority and right to direct and control all of the details of the Work, [ERT] being interested only in the result obtained . . . and shall be subject to [ERT's] general right of inspection." The Work Plan similarly provides that "[t]he [OSF] barge [superintendent] will determine the final procedure [for removal] based on actual site requirements," with ERT merely retaining the right for ERT's company man to "be informed of any changes."

Notwithstanding these contractual provisions, Plaintiff points to three pieces of evidence she asserts show operational control. First, she points to the deposition testimony of OSF's barge superintendent, where he purportedly admitted he needed approval from ERT's company man in order to make changes to the Work Plan. However, the barge superintendent's actual testimony was that, while he felt it important to discuss procedure with ERT's company man, he (not the company man) was in charge of all platform removal activities and the company man's primary role was to monitor OSF's work for

9

compliance with the Contract.  Because the barge superintendent's testimony is entirely consistent with OSF acting in the capacity of a true independent contractor pursuant to the terms of the Contract, it does not raise a genuine issue of material fact as to OSF's retention or exercise of operational control. *See Boutwell v. Chevron U.S.A., Inc.,* 864 F.2d 406, 409 (5th Cir. 1989) (concluding evidence that principal's company man discussed the independent contractor's work with its representative and informed the representative of deficiencies in that work did not raise genuine issue of material fact as to operational control because it was consistent with the contractor acting "in the capacity of a true independent contractor pursuant to the terms of the contractual arrangement").

Second, Plaintiff points to the declaration from an OSF welding foreman, which conclusorily states that "[t]he final procedures of the operation were subject to the approval of" ERT's company man and that ERT's company man "was ultimately in charge of the procedures and the entire operation."  The declaration, however, provides no factual support for these generalizations—which, if read broadly, would completely contradict the Work Plan attached to the declaration as an exhibit.  Moreover, the declaration does not indicate that ERT's company man (or any other ERT representative) detailed how the removal was to be performed or otherwise prevented OSF from conducting the removal in its own way, which would be required to show operational control. *See Fruge,* 337 F.3d at 564; *see also Landry,* 889 F.2d at 1471–72 ("[O]nly instructions designating 'how to' conduct operations merit application of the operational control exception." (quoting *Grammer v. Patterson Servs., Inc.,* 860 F.2d 639, 639 (5th Cir. 1988))).  Accordingly, the declaration's statements are insufficient to defeat summary judgment. *See Lechuga v. S. Pac. Transp. Co.,* 949 F.2d 790, 798 (5th Cir. 1992) (per curiam) ("Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence . .

. ."); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (recognizing that a non-movant cannot meets its summary judgment burden with conclusory allegations and unsubstantiated assertions).

Finally, Plaintiff points to ERT's purported "admission" in its letter to the BSEE that its company man was responsible for the safety and proper communication of the Work Plan. Plaintiff misapprehends the import of the letter. Under the Contract (and in day-to-day practice), OSF, not ERT, was responsible for ensuring the safety and proper communication of the Work Plan. The letter makes that clear: "oversight of the performance of the [W]ork [P]lan, including the prep work, appropriately falls within the responsibilities of OSF as a specialized contractor with thousands of hours of training and on-the-job experience related to the equipment and procedures necessary to safely perform decommissioning work." Thus, the letter's summary assertion about ERT's company man's responsibilities is, at most, evidence that the company man oversaw OSF's compliance with OSF's contractual obligations—which included ensuring the safety and proper communication of the Work Plan. Such oversight by a company man does not amount to an exercise of operational control. *See Duplantis*, 948 F.2d at 193; *Coulter*, 117 F.3d at 912; *see also Grammer*, 860 F.2d at 644 ("It is not enough that [the principal] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." (quoting Restatement (Second) of Torts § 414 cmt. c. (1965)) (emphasis omitted)).

In sum, the competent summary judgment evidence presents no genuine dispute of material fact as to whether the parties' conduct was at variance with the Contract and Work Plan. ERT's company man never dictated the work methods or operative details of the removal procedure; rather, the summary

judgment evidence compels the conclusion that he merely inspected OSF's procedure and work to ensure OSF's contractual compliance. Accordingly, the district court properly concluded that ERT did not exercise operational control.

### 2. *Express or Implied Authorization*

"If 'work is done in an unsafe manner, the [principal] will be liable if he has expressly or impliedly authorized the *particular manner* which will render the work unsafe, and not otherwise.'" *See Davis*, -- F.3d --, 2017 WL 1958950, at *2 (alteration in original) (quoting *Ewell v. Petro Processors of La., Inc.*, 364 So. 2d 604, 606–07 (La. Ct. App. 1978)). Thus, "absent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury, a principal . . . cannot be liable under the operational control exception." *Fruge*, 337 F.3d at 564 (omission in original) (quoting *Coulter*, 117 F.3d at 912); *see also Davis*, -- F.3d --, 2017 WL 1958950, at *2 (concluding principal's company man did not authorize an unsafe working condition that caused injury to the plaintiff—a personnel-basket transfer to an offshore platform in high winds—by ordering him to replace crane winch on the platform). Here, there is no evidence that ERT ordered OSF to engage in any work practice, let alone an unsafe one that led to an injury.

Citing *Williams v. Gervais F. Favrot Co.*, 499 So. 2d 623, 626 (La. Ct. App. 1986), Plaintiff argues that ERT's company man's participation in the decision to delay heavy lifts because of the weather is an indicator of authorization. However, *Williams* held that a principal was entitled to summary judgment where the undisputed evidence showed that its company man did not participate in a decision to engage in a particular work practice. 499 So. 2d at 626. It did *not* hold that a company man's mere participation in, or knowledge of, a decision to engage in a particular work practice was sufficient to defeat summary judgment. In this case, the evidence showing that ERT's company man participated in the decision to delay heavy lifts is

insufficient to defeat summary judgment because that same evidence shows that OSF's barge superintendent made the decision to delay heavy lifts and then discussed the delay with the company man. ERT's knowledge of OSF's plan of action is not the type of authorization contemplated by the operational control exception. *See Cormier v. W & T Offshore, Inc.*, No. 10-1089, 2013 WL 1567406, at *13 (W.D. La. Apr. 12, 2013). Indeed, it is tantamount to observing and failing to object to an unsafe work practice, which we have found does not rise to the level of express or implied authorization. *See Graham*, 21 F.3d at 646–47 (concluding that company man did not expressly or impliedly authorize unsafe work condition when he "merely observed" independent contractor's employees unsafely performing duties over which the contract gave them sole responsibility); *see also Ainsworth*, 829 F.2d at 551 ("Louisiana law will not support the imposition of liability upon [a principal] for failure to intercede in [an independent contractor's] decision to work [in an unsafe manner].").

Because there is no genuine dispute of material fact as to whether ERT authorized—either expressly or impliedly—OSF's unsafe practice that caused Plaintiff's injury or as to whether ERT reserved or exercised operational control over OSF's work, summary judgment on Plaintiff's vicarious liability claim was proper.

## B. Independent Negligence

Although we conclude that ERT cannot be held vicariously liable for the negligent acts of OSF, we must still consider whether ERT can be held liable for its own negligent acts. *See Graham*, 21 F.3d at 645. Under Louisiana law, "[a] principal generally has no duty to take affirmative steps to ensure the safety of a contractor's employees, but it may assume such a duty by contract or by later going beyond the contract and voluntarily policing the worksite for safety problems." *Ukudi v. McMoran Oil & Gas, L.L.C.*, 587 F. App'x. 119, 123 (5th Cir. 2014) (per curiam); *see also Graham*, 21 F.3d at 647–48.

No. 16-20611

Here, Plaintiff does not argue that ERT had an initial duty to ensure the Work Plan was safe and properly communicated—whether pursuant to the Contract, a statute or regulation, or otherwise. Plaintiff nonetheless argues ERT did voluntarily assume such a duty. However, she fails to explain precisely how (or why) ERT did so. Under the Contract, OSF—not ERT—had the duty to ensure the Work Plan was safe and properly communicated and Plaintiff does not point to any particular extra-contractual conduct by which ERT purportedly assumed the duty to ensure the Work Plan was safe and properly communicated. *See Graham*, 21 F.3d at 648 (discussing extra-contractual assumption of duty); *see also Ukudi*, 587 F. App'x at 122 (same). Instead, Plaintiff places great emphasis on ERT's purported "admission" in its letter to the BSEE that its company man was responsible for the safety and proper communication of the Work Plan. But, as previously discussed, the letter's summary assertion about ERT's company man's responsibilities is, at most, evidence that ERT's company man was responsible for overseeing OSF's compliance with OSF's contractual obligations. Plaintiff has not cited, and we have not located, any Louisiana authority holding that a principal assumes a duty to ensure the safety of the independent contractor's employees by merely stationing a company man on an oil platform for the purpose of overseeing a contractor's compliance with its contractual obligations. *See Graham*, 21 F.3d at 648 ("Amoco's 'company man' did not affirmatively assume any duty to provide Dual's employees with a safe work place simply by observing their unsafe work habits."); *see also Davenport v. Amax Nickel, Inc.*, 569 So. 2d 23, 28 (La. Ct. App. 1990).

But even if ERT did engage in an undertaking to ensure the Work Plan was safe and properly communicated, as Plaintiff asserts, summary judgment was still proper. *See LeJeune*, 950 F.2d at 271 (concluding that, even if the principal voluntarily undertook an effort to ensure the safety of an

14

independent contractor's employees by publishing a safety manual, the principal was not liable to the plaintiff because the independent contractor and plaintiff did not act in reliance upon the manual); *see also Lazzell v. Booker Drilling Co.,* 816 F.2d 196, 198 (5th Cir. 1987). In her briefing, Plaintiff seems to argue that ERT could be held liable under Louisiana law if it failed to exercise reasonable care in performing its purportedly voluntary undertaking to ensure the Work Plan was safe and properly communicated—even if that undertaking did not increase the risk of harm to Mr. Voces or his injury was not a consequence of reliance on that undertaking. But, as ERT points out, each one of the number of cases Plaintiff cites in support of her interpretation of Louisiana law involved a situation where the defendant's undertaking did, in fact, increase the risk of harm or where the plaintiff's injury was, in fact, the consequence of reliance on the defendant's undertaking. *See, e.g., Dupre v. Chevron U.S.A. Inc.*, 913 F. Supp. 473, 483 (E.D. La. 1996) (granting summary judgment because the record demonstrated the independent contractor "did not shirk its safety responsibility in reliance on any action by" the principal), *aff'd,* 109 F.3d 230 (5th Cir. 1997) (per curiam).

For instance, Plaintiff cites the Louisiana Supreme Court's decision in *Harris v. Pizza Hut of Louisiana, Inc.*, 455 So. 2d 1364 (La. 1984), in support of her interpretation of Louisiana law. But the Louisiana Supreme Court expressly rejected Plaintiff's interpretation of that case:

> *Pizza Hut* does not stand for the proposition that a business assumes the duty to protect its customers from the criminal acts of third persons merely because it undertakes some security measures. Rather, *Pizza Hut* was an ordinary negligence case, holding that a security guard employed by a business must exercise reasonable care for the safety of the business' patrons and breaches that duty when his actions cause an escalation in the risk of harm. In *Pizza Hut*, the restaurant's security guard was negligent because he heightened the risk of harm to Pizza Hut's

customers by provoking gunfire from armed robbers who had entered the restaurant.

*Posecai v. Wal-Mart Stores, Inc.*, 752 So. 2d 762, 769 n.7 (La. 1999) (emphasis added). Plaintiff also unavailingly cites the Louisiana court of appeals' decision in *Moore v. Safeway, Inc.*, 700 So. 2d 831 (La. Ct. App. 1996). There, the court of appeals affirmed the jury's verdict against the principal precisely because the principal precluded competent supervision by the plaintiff's employer by undertaking a duty to direct the prioritization of the independent contractor's work.[9] *Id.* at 847.

Here, unlike the cases Plaintiff cites, there is no evidence of an increase in risk or reliance to support a claim for independent negligence. Indeed, in her reply brief, Plaintiff seems to tacitly concede that no such evidence exists, merely arguing that an increase in risk or reliance is not mandatory. Plaintiff's reply brief points to section 324A of the Restatement (Second) of Torts in support of this assertion.[10] But even if we assume *arguendo* that Section 324A

---

[9] Similarly, Plaintiff unavailingly cites *Crane v. Exxon Corp., U.S.A.*, 613 So. 2d 214 (La. Ct. App. 1992), where the principal voluntarily policed the wellsite for safety problems and reprimanded the independent contractor for various safety violations (a situation likely to engender reliance) *and* increased the risk of injury to the plaintiff by requiring the hole or chute into which the plaintiff stepped to be installed. *Id.* at 218, 221; *see also Graham*, 613 So. 2d at 221 (discussing *Crane*); *see also, e.g., Maxwell v. Nabors Drilling U.S.A., Inc.*, No. 98–1339, 1999 WL 460777, at *7–8 (E.D. La. June 29, 1999) (same), *aff'd sub nom.*, *Maxwell v. Nabors Drilling USA*, 211 F.3d 594 (5th Cir. 2000) (per curiam).

[10] Section 324A provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

   (a) his failure to exercise reasonable care increases the risk of such harm, or
   (b) he has undertaken to perform a duty owed by the other to the third person, or
   (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

governs this case,[11] Plaintiff's reply brief does not explicitly argue that subsection (b) of Section 324A is satisfied (subsections (a) and (c) require an increase in risk and reliance, respectively), much less cite evidence raising a genuine issue of material fact as to that subsection. As interpreted by the Louisiana Supreme Court, subsection (b) requires a showing that the defendant's undertaking was intended to supplant, not merely supplement, the duty another owed to the plaintiff.[12] *See Bujol v. Entergy Servs., Inc.,* 922 So. 2d 1113, 1136 (La. 2004), *on reh'g*, 922 So. 2d 1145, 1148 (La. 2004). In the absence of any argument or evidence showing that ERT intended to supplant, not merely supplement, OSF's duty to ensure the Work Plan was safe and properly communicated (or an increase in risk as a result of, or reliance on, ERT's purported undertaking), summary judgment was, in any event, proper as to Plaintiff's independent negligence claim.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

We note that section 43 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm (2012) is a more recent version of this provision.

[11] It is not clear that section 324A, rather than Section 323, of the Restatement (Second) of Torts governs this case. Section 323 addresses the liability of one who undertakes to render services to another for harm to the other (not to a third party) resulting from his or her failure to exercise reasonable care. *See* Restatement (Second) of Torts §§ 323 & 324A cmt. a. Here, Mr. Voces appears to be the person for whom Plaintiff alleges ERT voluntarily undertook the effort to ensure the safety and proper communication of the Work Plan. Thus, Section 323 would seemingly apply to require an increase in risk or reliance. *See id.* § 323.

[12] Because Louisiana courts have not yet expressly adopted the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, *see Morvant v. Oil States Int'l, Inc.,* 3 F. Supp. 3d 561, 565 n. 17 (E.D. La. 2014), and because Plaintiff does not argue that the Louisiana Supreme Court would adopt it, we need not, and do not, decide whether the same result would obtain under section 43 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm.