John LeJEUNE and Loretta LeJeune,
Plaintiffs–Appellants,

and

Aetna Casualty and Surety Company,
Intervenor–Appellant,

v.

SHELL OIL COMPANY, et al.,
Defendants–Appellees.

No. 91–3083.

United States Court of Appeals,
Fifth Circuit.

Jan. 10, 1992.
Rehearing Denied Jan. 30, 1992.

Philip Miles Bradley, Gordon R. Crawford, Gonzales, La., for LeJeune.

David K. Johnson, Funderburk & Andrews, Baton Rouge, La., for intervenor-appellant Aetna Cas. Co.

Robert A. Knight, B. Frank Davis, Bernard, Cassisa, Saporito & Elliott, Metairie, La., for Shell Oil Co.

Before REYNALDO G. GARZA, GARWOOD, Circuit Judges, and MAHON, District Judge.[*]

REYNALDO G. GARZA, Circuit Judge:

Plaintiffs contest the district court's grant of summary judgment in favor of Shell Oil Company (Shell), dismissing plaintiff John LeJeune's allegation that he suffered injury while performing maintenance duties at a Shell Complex. For the reasons stated below, the district court's Order of Summary Judgment is AFFIRMED.

## BACKGROUND

On March 10, 1987, Cajun Painting, Inc. (Cajun), contracted with Shell to perform certain painting operations at its Norco Manufacturing Complex. On February 3, 1989, plaintiff-appellant John LeJeune (LeJeune), a Cajun employee, was spray-painting the bottom of a pipe rack. He had performed this job previously, but a Shell employee had determined that the work was unsatisfactory and had to be redone. As the pipe rack was only between six to twelve inches off the ground, LeJeune had to kneel on the top of the pipes and reach under the rack with the spray-gun in one hand, while holding onto a pipe to steady himself with the other hand. According to LeJeune, his hand holding the pipe slipped, and he injured his back.

LeJeune and his family filed suit in state court against Shell and two Shell employees, Plant Manager Frederick Foster and Safety Supervisor Ernie Martin. Shell filed a Notice and Petition of Removal, claiming that LeJeune had no case against the two employees, and had joined them merely to destroy diversity. Plaintiffs filed a Motion to Remand the case to state court. The trial court denied plaintiffs' motion.

Shell then filed a Motion for Summary Judgment, which the court granted on January 9, 1991, dismissing plaintiffs' case.

## ANALYSIS

After reviewing the evidence and inferences to be drawn therefrom in the light most favorable to the nonmoving party, summary judgment is mandated "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Moreover, "this Court reviews the grant of summary judgment *de novo*, using the same criteria used by the district court in the first instance." *Abshire v. Gnots–Reserve, Inc. (In re Copper/T. Smith)*, 929 F.2d 1073, 1076 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991) (*citing Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988)).

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, "the substantive law will identify which facts are material." *Id.* Having reviewed the record, we are persuaded that the district court correctly determined that there is no genuine issue of material fact and that Shell is entitled to judgment as a matter of law.

I. Shell's Safety Guidelines are not a Basis for Liability.

Plaintiffs claim that a genuine issue of material fact exists as to whether Shell failed to follow its own Safety Guidelines,

---

[*] District Judge of the Northern District of Texas, sitting by designation.

and was therefore in violation of Louisiana Civil Code art. 2315.

Shell publishes a manual applicable to its Norco complex entitled *Shell Safety Guidelines and Requirements for Contractors* (the Manual). This Manual is clearly intended for use by contractors in formulating their own safety procedures. According to the policy statement at the front of the Manual, "[i]n addition to adhering to applicable local, state, and federal regulations, contractors are expected to develop safety procedures manuals to be used by their supervisors and employees in the performance of work at Shell locations.... In keeping with that objective, overall safety guidelines and requirements have been developed to assist the contractors in preparing their safety procedures manual."

The Manual is a lengthy document and contains safety procedures which contractors are expected to follow. Moreover, according to the Manual, work could not begin until Shell issued a safe work permit, which Shell did issue in this case. According to the Manual, above and beyond the safety Guidelines which the contractor was to follow, Shell did have certain responsibilities prior to the issuance of a safe work permit. Such a permit, according to the Manual, could not be issued until Shell and the contractor had jointly inspected the area to be worked on. Moreover, Shell was to examine the area to be worked on to be sure that it was safe.[1] In addition, Shell was to "issue explicit instructions to the craftsman to warn him of any potential safety problems, special precautions, or protective equipment which may be required (e.g. respiratory protection, hearing protection, acid hoods, etc.)."

The kind of "potential safety problems" requiring "explicit instructions" under the Manual clearly are not the type encountered by plaintiff in the performance of his job. More importantly, "[w]e have frequently noted that, under Louisiana law,

'the relationship between the principal and the independent contractor is in large measure determined by the terms of the contract itself.'" *Duplantis v. Shell*, 948 F.2d 187, 193 (5th Cir.1991) (*quoting Ham v. Pennzoil*, 869 F.2d 840, 842 (5th Cir. 1989)). According to the contract between Shell and Cajun, "[c]ontractor shall act as an independent contractor on all work covered by this contract. He shall maintain complete control over and have full responsibility for his employees." Moreover, "[c]ontractor shall perform all work diligently, carefully and in a good workmanlike manner, shall furnish all labor, supervision, machinery, equipment, materials and supplies necessary therefor ..."

Regarding safety, the contract stated: The contractor shall perform all work in such a manner as to cause a minimum of interference with buyer's operations, and shall take all necessary precautions (including those required by the buyer's safety regulations) to protect the premises and all persons and property thereon from damage or injury and shall assume responsibility for the taking of such precautions by employees, agents, permitters and sub-contractors.

The contract further required that: Contractor shall maintain his own independent safety program and shall provide such safety equipment and protective clothing as required. He shall strictly enforce all rules and regulations set forth in our "Safety Guidelines and Requirements for Contractors."

According to the contract, Cajun was responsible for safety and for supervision. The record reveals that LeJeune's supervisor, Brian Gaubert (Gaubert), was a Cajun employee. According to Gaubert's affidavit:

Cajun Painting paid John LeJeune's weekly salary, provided him with the necessary tools, assigned and supervised his

---

**1.** The Court doubts that this Guideline refers to the kind of "hazard" of which plaintiffs complain. According to the manual:

"Before the arrival of the craftsman, [Shell] will determine that the equipment planned for repairs is properly prepared and ready for mainte-

nance. In this way, [Shell] will assure that safe working conditions exist prior to any work commencing. [Shell] must assure that the facilities are depressured, free of hydrocarbons and chemicals, and locked out or deactivated and tagged as required by Complex procedures."

daily work; ... I, as Cajun Painting foreman, was responsible for the supervision of John LeJeune's work, activities and safety at the Norco Manufacturing Complex.

Therefore, if there was negligence regarding safety, it was Cajun's negligence. Plaintiffs place great reliance on the expert testimony of Michael Frenzel who testified that there were safer methods available for painting the pipe rack. It was Cajun's responsibility, however, to devise the method of performing the work. Therefore, plaintiffs can only succeed under their art. 2315 theory if Shell is responsible for Cajun's hypothetical negligence.

■ We note that "[u]nder Louisiana law, a principal generally is not liable for the offenses an independent contractor commits in the course of performing contractual duties." *Triplette v. Exxon Corp.*, 554 So.2d 1361, 1362 (La.App., 1st Cir.1989). Two exceptions exist. One is if the work the contractor is to perform is "ultrahazardous." *Id.* Plaintiffs do not claim that LeJeune's job fit this description. "The second exception imposes liability upon a principal for the negligent acts of an independent contractor when the principal reserves the right to supervise or control the work." *Id.* at 1363. In other words, "[a] principal is not liable for the torts of an independent contractor unless the principal exercises operational control over or expressly or impliedly authorizes the independent contractor's actions." *Duplantis*, at 192 (*quoting Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir.1989)).

In *Landry*, we found that:

In order for [a principal] to be liable for the actions of an [independent contractor], the [principal] must have retained at least some degree of control over the manner in which the work was done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations. Such a general right

is usually reserved to employers, but this does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of right of supervision that the contractor is not entirely free to do the work in his own way.

*Landry*, 889 F.2d at 1471 (*quoting* RESTATEMENT (SECOND) OF TORTS § 414, comment c) (*quoted in Duplantis* at 193).

■ Shell did not retain operational control in its contract with Cajun. Plaintiffs argue that the Manual implies the contrary. The *Triplette* court, however, found that

even though the contract required that [the contractor] comply with [the principal's] safety standards, this requirement does not signify the requisite right of operational control sufficient to vitiate the independent contractor relationship. The test for determining owner-independent contractor status is direct supervision over the step-by-step process of accomplishing the work.

554 So.2d at 1363.

Shell did not retain this kind of direct operational control over Cajun and, under Louisiana law, "[t]he fact that a principal takes an active interest in the safety of the employees of its independent contractor does not, in and of itself, constitute direct operational control." *Duplantis* at 193.

Plaintiffs argue that even if Shell would not normally have a duty to devise a method for safely painting the pipe rack, Shell voluntarily undertook an obligation to assist by publishing the Manual. Plaintiffs rely on *Lazzell v. Booker Drilling Co., Inc.*, 816 F.2d 196 (5th Cir.1987). In that case, we noted that:

Louisiana has adopted the general tort rule that no one has a duty to go to the assistance of another, but, once a person voluntarily and gratuitously undertakes an obligation to assist someone, he must carry through on the obligation to its completion if the person being assisted relies on the proffered help.

*Id.* at 198 (footnote omitted).

In *Lazzell*, a nonemployee wireline operator who had gone out to an oil platform

prior to the arrival of a dangerous tropical storm to plug wells prior to the evacuation of the platform had injured himself while attempting to singlehandedly lift a 150 lb. valve. The plaintiff had gone out to the platform on reliance on the assurances of the oil company that he would get all the help he needed. The employees on the platform, however, did not assist him. We determined that, under these circumstances, the jury was justified in finding that the oil company was liable to the plaintiff. *Id.* Nothing in the record before us, however, indicates that LeJeune was painting the rack on some kind of reliance induced by the Manual. Therefore, plaintiffs' reliance on *Lazzell* is misplaced.

## II. The District Court Properly Denied Plaintiffs' Motion to Remand to State Court.

■ Plaintiffs contend that the district court erred in determining that they had no valid claims against the non-diverse parties. In this circuit, a removing party's claim of fraudulent joinder to destroy diversity is viewed as similar to a motion for summary judgment. *Carriere v. Sears, Roebuck and Co.*, 893 F.2d 98, 100 (5th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990). A court is to pierce the pleadings to determine whether, under controlling state law, the non-removing party has a valid claim against the non-diverse parties. *Id.* Of course, "[t]he removing party bears the burden of demonstrating fraudulent joinder." *Id.* Otherwise stated:

> The standard for judging fraudulent joinder claims of this sort is clearly established in this circuit: After all disputed questions of fact and all ambiguities in the controlling state law are resolved in favor of the nonremoving party, the court determines whether that party has any possibility of recovery against the party whose joinder is questioned.

*Id.*

■ Plaintiffs allege that both Martin and Foster are liable under Louisiana Civil Code art. 2320, which states, in relevant part, that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.... [However,] responsibility only attaches[ ] when the masters or employers ... might have prevented the act which caused the damage, and have not done it."

Plaintiffs claim that "[t]he lower court erred by not determining whether defendant Frederick Foster, Plant Manager, or Ernie Martin, Safety Supervisor or both of them had the responsibility as the overseer to insure the terms of the obligation [to issue safety instructions and to insure a safe working environment] were followed by Shell's employees. Both Martin and Foster by their respective title [sic] alone were in charge and should be vicariously liable for the omissions of their employee."

Under Louisiana law, however,

> personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.

*Canter v. Koehring Co.*, 283 So.2d 716, 721 (La.1973).

Plaintiffs do not allege that either Shell employee was at the scene of the alleged accident when it occurred. Rather, plaintiffs allege that Martin and Foster are vicariously liable due to their titles. Under *Canter*, this claim fails. Moreover, as we determine that plaintiffs have no valid claim against Shell at all, plaintiffs' claim of vicarious liability against Martin and Foster necessarily fails.

### III. Plaintiffs Have Abandoned Their Strict Liability Claim.

 In their Amended Complaint, plaintiffs, in a single sentence, allege a strict liability cause of action under Louisiana Civil Code art. 2322, according to which "[t]he owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction." We presume that plaintiffs would argue that expert testimony in the record that alternative designs would have rendered the pipe rack safer for maintenance implies that the pipe rack was defectively designed. The record contains no testimony, however, that the pipe rack was defectively designed. It does not suffice for plaintiffs to show that safer alternatives were available.

Moreover, nothing in the record indicates that Shell designed the pipe rack, which is affixed to the complex which, the record indicates, was constructed by an independent organization and was later purchased by Shell. Plaintiffs have offered no evidence to the contrary. Even if this would not serve as a valid defense under art. 2322, we doubt that the allegations under review call art. 2322 into play. While the pipe rack may have been hazardous to work with, plaintiffs do not allege any "vice in its original construction." There is no allegation of structural failure.

More importantly, plaintiffs did not raise the issue of art. 2322 in their briefs on this appeal. Therefore, "[i]n accordance with the long-standing rule in this circuit, th[is] issue[ ] [is] deemed abandoned." *Hobbs v. Blackburn*, 752 F.2d 1079, 1083 (5th Cir.), *cert. denied*, 474 U.S. 838, 106 S.Ct. 117, 88 L.Ed.2d 95 (1985).

### CONCLUSIONS

As a matter of law, Cajun was solely responsible for devising a method by which LeJeune was to paint the pipe rack and plaintiffs cannot recover from Shell. Moreover, the district court did not err in finding that plaintiffs have no valid claim against Martin and Foster. The district court's Order of Summary Judgment is

AFFIRMED.