# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-30767

United States Court of Appeals
Fifth Circuit

**FILED**
August 27, 2018

Lyle W. Cayce
Clerk

TYLER RENWICK,

> Plaintiff - Appellant

v.

P N K LAKE CHARLES, L.L.C., doing business as L'Auberge du Lac,

> Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before DAVIS, HAYNES, and DUNCAN, Circuit Judges.
STUART KYLE DUNCAN, Circuit Judge:

Tyler Renwick ("Renwick") was injured when he fell off a defective ladder spanning the narrow gap between a casino vessel and hotel owned by PNK Lake Charles LLC ("PNK"). Renwick was an employee of a subcontractor hired to clean ventilation equipment on the hotel roof. He sued PNK for damages under Louisiana law, claiming PNK was liable as both the owner of the premises and the custodian of the ladder. The district court granted summary judgment to PNK, however, dismissing all of Renwick's claims with prejudice. Renwick appealed. We conclude that genuine fact issues exist as to whether PNK may be liable for Renwick's injuries. Accordingly, we REVERSE the district court's judgment and REMAND for further proceedings.

No. 17-30767

## I.

## A.

We recite the facts drawing all justifiable inferences in Renwick's favor because he was the non-moving party below. *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002).

Renwick was an employee of PB Technologies LLC ("PB"), a Texas company that cleans commercial kitchen vents and hoods. In 2007, PB was hired by general contractor JC Myers ("Myers") to clean restaurant ventilation equipment at the L'Auberge du Lac ("L'Auberge") hotel and casino in Lake Charles, Louisiana. L'Auberge was owned by PNK.[1]

L'Auberge consisted of a floating casino vessel next to a hotel. The ventilation equipment to be cleaned was located inside the hotel kitchens and on the hotel's roof and side. PNK controlled contractor access to the hotel and casino premises, including the roof areas. During the initial walk-through in 2007, PNK personnel instructed PB how to access the hotel roof: PB's crew members would proceed up to the adjacent casino's roof—situated about 10 feet below the hotel roof—and from there climb a ladder leaning against the hotel. The ladder spanned a two-to-three-foot gap between casino and hotel, with a considerable drop (about 50 feet according to some estimates) to a gangway below. PNK specified that ladder access from the casino roof was the only way to reach the vents on the hotel roof, and at that time did not disclose to PB or Myers any alternate access. During this initial walk-through, there was an old wooden ladder on the casino roof used to access the hotel roof, but the parties agree this ladder was subsequently replaced with various fiberglass extension ladders and so played no role in Renwick's subsequent accident.

---

[1] Because PNK owned L'Auberge, we use "PNK" to refer interchangeably to PNK, L'Auberge, and their respective employees, unless otherwise indicated.

2

No. 17-30767

Dissatisfied with the ladder arrangement, PB proposed that PNK construct a platform to ensure safer access to the hotel roof. PB had its operations manager, Robert Gee, present PNK with designs for a platform, but PNK rejected this proposal, citing budget concerns. As a result, over the years-long course of the cleaning contract, PB crew members would access the hotel roof via ladders that leaned across the casino-hotel gap and that were typically tied to a railing on the casino roof. The parties dispute who owned the ladders and who routinely set them up. They agree, however, that PNK did not supervise the day-to-day work of PB crew members.

In the early morning hours of July 14, 2015, Renwick climbed a ladder from the casino roof to the hotel to turn off a ventilation fan on the hotel roof. Before reaching the hotel roof, however, Renwick fell from the ladder onto the gangway below, suffering serious injuries. While the precise circumstances of the accident were murky (Renwick lacked a clear memory of what happened), it is undisputed that the ladder at issue consisted of only one-half of an extension ladder and therefore lacked stabilizing feet. As a result, the ladder apparently slipped out from under Renwick before he reached the hotel roof. The parties agree that the ladder in question was defective and unsafe. Again, however, they dispute who owned the ladder and who set it up.

Following Renwick's accident, PNK showed PB personnel for the first time an alternate way to reach the hotel roof through the hotel interior. From that point on, PB crew members began using this new means of access when performing their cleaning duties.

B.

In September 2015, Renwick sued PNK in federal court, alleging PNK was negligent under Louisiana Civil Code article 2315 and also liable as the owner or custodian of a defective thing under article 2317.1. In April 2017, the

3

district court granted PNK's summary judgment motion and dismissed all of Renwick's claims with prejudice.

As to negligence, the district court relied on the Louisiana rule that a premises owner is typically not liable for an independent contractor's[2] negligence. *See generally, e.g., Meaux v. Wendy's Int'l, Inc.,* 10-111 (La. App. 5th Cir. 10/26/10), 51 So.3d 778, 784. The court concluded that no genuine fact dispute triggered any exception to that general rule. Specifically, the court found no dispute that PNK lacked "operational control" over PB's work because the evidence showed, at most, that PNK only identified the "point of access" to the hotel roof while leaving PB free to "determine[ ] what ladders to use" to traverse the casino-hotel gap. The court also found no dispute concerning whether PNK had given "explicit or implicit authorization to an unsafe practice," because it found no evidence to show that PNK was aware PB employees were using defective ladders to access the hotel roof.[3]

As to liability for a defective thing, the district court assumed that PNK had "custody or '*garde*'" of the ladder, but found the evidence undisputed that the ladder's defect did not amount to an "unreasonably dangerous condition." Specifically, the court relied on undisputed evidence that Renwick failed to inspect the ladder before using it in violation of PB's training policies and federal safety regulations.

---

[2] The district court concluded that under Louisiana law PB qualified as an independent contractor who had been subcontracted by Meyers to perform the vent cleaning work at L'Auberge. Renwick contested that conclusion below—arguing that PB instead "took over a portion of … Meyers' work"—but the district court rejected Renwick's argument. It is unclear whether Renwick appeals that finding, but given our disposition of the other issues we need not consider it.

[3] The court also concluded that PB's work was not "inherently dangerous," given undisputed evidence that "climbing a ladder between the two structures could be performed safely" if using proper equipment and procedures. *See, e.g., Meaux,* 51 So.3d at 784 (observing that a principal may remain liable where contracted work is intrinsically and inherently dangerous). Renwick does not appeal this conclusion and so we do not consider it.

No. 17-30767

Renwick moved for a new trial or, alternatively, to alter or amend the judgment, which was denied in September 2017. Renwick timely appealed both the grant of summary judgment and the denial of his post-trial motion.

II.

We review a grant of summary judgment *de novo. United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008). Summary judgment is proper only if the pleadings and record materials reveal no genuine issue as to any material fact. *TIG Ins. Co.*, 276 F.3d at 759 (citing *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)); FED. R. CIV. P. 56. A "material" fact is one "that might affect the outcome of the suit under governing law," *Andersen*, 477 U.S. at 248, and a fact issue is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party," *TIG Ins. Co.*, 276 F.3d at 759 (citing *Andersen, supra*). If the moving party initially shows the non-movant's case lacks support, "the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *TIG Ins. Co.*, 276 F.3d at 759 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587 (1986); FED. R. CIV. P. 56(e)). We must view the evidence in the light most favorable to the non-moving party, drawing "all justifiable inferences … in the non-movant's favor." *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008); *see also Andersen*, 477 U.S. at 255 (explaining "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor") (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

Louisiana's substantive law applies in this diversity case, and we review the district court's determination of Louisiana law *de novo. See, e.g., Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249, 258 (5th Cir. 2013) (citations omitted). In determining Louisiana law, we "should first look to final decisions of the Louisiana Supreme Court." *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204

No. 17-30767

F.3d 624, 627 (5th Cir. 2000). To the extent the supreme court has not resolved an issue, then we "must make an '*Erie* guess' and 'determine as best [we] can' what the Louisiana Supreme Court would decide." *Id.* (quoting *Krieser v. Hobbs*, 166 F.3d 736, 738 (5th Cir. 1999); *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)). To inform our *Erie* guess, we "may look to the decisions of intermediate appellate state courts," which provide "'a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Howe*, 204 F.3d at 627 (citing *Labiche v. Legal Sec. Life Ins. Co.,* 31 F.3d 350, 351 (5th Cir. 1994) (quoting *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)).[4]

## III.

Our analysis proceeds as follows. In part A, *infra*, we address whether the district court properly granted PNK summary judgment on premises owner liability. Specifically, we address the exceptions for operational control in part A.1, and for authorization of an unsafe practice in part A.2. In part B, *infra*, we address whether the district court properly granted PNK summary judgment on liability for a defective thing. Finally, in part C, *infra*, we address whether we may affirm on the alternate ground of superseding cause. As explained below, we reverse the district court's grant of summary judgment, finding genuine fact issues on whether PNK may be liable for Renwick's injuries as either a premises owner or the custodian of a defective thing. We

---

[4] Louisiana's substantive law includes Louisiana's choice-of-law rules. *See, e.g., Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007). The district court correctly concluded that those rules pointed to Louisiana law, given L'Auberge's location in Louisiana and the fact that PNK does business in Louisiana. *See* LA. CIV. CODE art. 3542 (governing choice of law in delictual and quasi-delictual actions and considering, *inter alia*, "the place of conduct and injury," the "place of business of the parties," and "the state in which the relationship … between the parties was centered"). Neither party contests that ruling.

No. 17-30767

decline to affirm on the alternate ground of superseding cause, finding that the record also raises genuine fact issues as to that doctrine.

A.

Under Louisiana law, a premises owner is generally not liable for damages caused by the actions of an independent contractor. *See generally, e.g., Meaux,* 51 So.3d at 785; *Thomas v. A.P. Green Indus., Inc.*, 2005-1064 (La. App. 4 Cir. 5/31/06), 933 So.2d 843, 852; *see also Davis v. Dynamic Offshore Res., LLC*, 865 F.3d 235, 236 (5th Cir. 2017) (observing "it is well established" under Louisiana law "that a principal is not liable for the activities of an independent contractor committed in the course of performing its duties under the contract") (internal quotations and citation omitted). That general rule is subject to exceptions, however. As relevant here, a premises owner may be liable (1) if he exercises "operational control" over the independent contractor's actions, or (2) if he "expressly or impliedly authorizes an unsafe practice." *Davis*, 865 F.3d at 236; *see also, e.g., Sandbom v. BASF Wyandotte Corp.*, 95-0335 (La. App. 1 Cir. 4/30/96), 674 So.2d 349, 353–54 (noting exceptions to general rule "when the principal reserves the right to supervise or control the work of the independent contractor … or gives express or implied authorization to an unsafe practice") (and collecting authorities).[5] Here, the district court ruled that the evidence raised no genuine issue as to the applicability of either exception, and so granted PNK's motion for summary judgment. Renwick urges on appeal that the district court improperly resolved fact disputes

---

[5] Liability under these exceptions would arise from the general principle of Louisiana tort law that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." LA. CIV. CODE art. 2315; *see also, e.g., King v. Cancienne*, 316 So. 2d 366, 367 (La. 1975) (discussing history of article 2315); *Meaux*, 51 So. 3d at 783 (observing that negligence actions are based on article 2315).

No. 17-30767

concerning whether PNK exercised operational control over PB's activities and whether PNK authorized an unsafe practice that caused his injuries.

1.

This Court has previously addressed what constitutes operational control under this branch of Louisiana law. "Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way." *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003) (citing *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992); *McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 175 n.9 (5th Cir. 1979)). "It is not enough," however, that the principal "has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations." *LeJeune*, 950 F.2d at 270 (internal quotations omitted) (citing *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989)). Moreover, "[p]eriodic inspections by a principal's 'company man' do not equate to that principal retaining control over the operations conducted by [an independent contractor]." *Fruge*, 337 F.3d at 564 (citing *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987)). Rather, there must be "'control over the operative detail of doing any part of the work,'" such that the "'contractor is not entirely free to do the work in his own way.'" *Grammer v. Patterson Servs., Inc.*, 860 F.2d 639, 644 (5th Cir. 1988) (quoting RESTATEMENT (SECOND) OF TORTS, § 414, cmt. a (1965)); *see also, e.g., Klein v. Cisco-Eagle, Inc.*, 37,398 (La. App. 2nd Cir. 9/24/03), 855 So. 2d 844, 850; *and see generally* FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW ("Maraist & Galligan") § 13.02[3], at 13-16 n.47 (2004 ed.) (discussing operational control).

8

The district court concluded that Renwick did not point to evidence that "r[o]se[ ] to the level necessary to find that there is a genuine dispute as to whether PNK exercised operational control." In the court's view, the record revealed (1) that PNK employees made a "non-binding" recommendation that PB employees use the original wooden ladder to access the hotel roof; (2) that PNK and PB had no "discussions" about providing access ladders; (3) that PNK did not "kn[o]w of any ladders on the roof other than the wooden ladder"; and (4) that determining which ladders to use was "within the scope of PB's work order." The court therefore concluded there was no evidence creating a genuine fact issue as to PNK's operational control.

We disagree. There is record evidence from which a trier of fact could conclude that PNK exercised operational control over the details of PB's work that allegedly led to Renwick's accident. To begin with, PNK's facilities director, Anthony Long, testified that PNK controlled contractor access to the hotel and casino premises, including the roof areas. More specifically, both PB's owner, Paul Barnes, and its operations manager, Robert Gee, testified that during the initial walk-through in 2007 PNK identified *where* PB employees were to access the hotel roof vents (i.e., from the adjacent casino roof) and *how* they would do so (i.e., by using ladders secured to the casino roof and leaning across the casino-hotel gap). When PB objected to this means of access and proposed designs for a platform, PNK rejected the proposal for budgetary reasons. Furthermore, PNK expressly told PB that the ladder arrangement was the *only* way to access the hotel roof vents; after Renwick's accident, however, PNK revealed an alternate means of access through the hotel interior.[6] Finally (as discussed in greater detail *infra*), the evidence reveals a

---

[6] In its summary judgment motion, PNK did not contest many of these points (at least for summary judgment purposes). Specifically, PNK did not contest: (1) that during the initial walk-through "an unidentified employee of L'Auberge allegedly informed PB and JC Myers

pointed dispute about who provided and set up the fiberglass extension ladders over the course of the cleaning contract, with PB vigorously asserting that it did *not* erect the ladders—including the defective ladder that figured in Renwick's accident—and that it found those ladders "always already set up and tied off" on the casino roof. We emphasize that it is this *combination* of evidence—PNK's control of work-site access, its specific instructions about how to reach the vents, its rejection of an alternate access route, and the dispute over who provided the access ladder—that creates a jury issue on operational control.[7]

From this evidence, a fact finder could reasonably conclude that PNK's role in the work went beyond "mak[ing] suggestions or recommendations which need not necessarily be followed," *LeJeune*, 950 F.2d at 270, but instead rose to the level of "control over the operative detail of … the work," such that the PB was "not entirely free to do the work in [its] own way." *Grammer*, 860 F.2d at 644 (brackets added). In other words, the evidence would permit the conclusion that PNK "retained at least some degree of control over the manner

---

that access to the hotel roof was to be had by use of a ladder from the casino roof"; (2) that "no other access to the roof was ever disclosed by L'Auberge or known to PB prior to the accident"; and (3) that "the ladder access was an unsafe means of ingress and egress for which L'Auberge should be liable." Instead, PNK argued that "the negligence of PB, JC Myers, and the Plaintiff himself" superseded any negligence by L'Auberge. We address PNK's argument on superseding cause in part C, *infra*.

[7] In light of this evidence, we reject the district court's reasons for granting summary judgment. The fact that PNK made a "non-binding recommendation" to use the original wooden ladder is irrelevant; we agree with the district court that this *alone* would not create a genuine fact issue on operational control. The pertinent issue, however, is who provided and set up the *different* ladder involved in the accident, a matter disputed in the record. And the facts that PNK denied discussing ladders with PB, disclaimed knowledge of ladders besides the wooden one, and asserted the choice of ladders was PB's are not reasons for granting PNK summary judgment. Instead, they are factual assertions that a jury may or may not credit, after balancing PB's contrary evidence that it never provided any ladders and always found access ladders already set up (including the ladder that allegedly injured Renwick).

10

in which [PB's] work was done," and thus exercised operational control. *LeJeune*, 950 F.2d at 270 (brackets added). To be sure, a fact finder could ultimately reach a different conclusion. All we decide is that the evidence—viewed, as it must be, in the light most favorable to Renwick—would permit a reasonable trier of fact to resolve the operational control issue either way, and that the district court therefore erred in granting summary judgment. *See, e.g., Andersen*, 477 U.S. at 253 (explaining that, "[i]f either of the two results … is fairly possible, [the court] must let the jury decide the matter").

2.

As indicated above, another exception to the non-liability rule applies when a premises owner gives "express or implied authorization to an unsafe practice." *Meaux*, 51 So.3d at 785; *see also, e.g., Davis*, 865 F.3d at 236 (explaining that, under Louisiana law, if "work is done in an unsafe manner, the [principal] will be liable if he has expressly or impliedly authorized the particular manner which will render the work unsafe, and not otherwise") (citing *Ewell v. Petro Processors of La., Inc.*, 364 So.2d 604, 606–07 (La. App. 1st Cir. 1978)) (brackets added). The district court granted PNK summary judgment on this ground as well, finding the evidence undisputed that PNK had not expressly or impliedly authorized an unsafe practice.

We again disagree. The evidence recounted above could also permit a reasonable fact finder to conclude that PNK authorized the unsafe practice that allegedly resulted in Renwick's injury. That is, a fact finder could reasonably conclude that PNK directed PB employees to access the hotel roof vents at a specific location (from the casino roof), using a specific means of access (ladders leaning across the casino-hotel gap) and, moreover, that PNK concealed from PB a safer access point (the hotel interior). Furthermore, a fact finder could also reasonably conclude that PNK (and not PB) provided and

secured the ladders that PB employees used for access, including the ladder that allegedly injured Renwick.

For instance, PB's owner, Barnes, was asked in a deposition, "[o]n the evening of this accident, can you tell me who first erected the ladder before Mr. Renwick's accident?" Barnes responded:

> That's the way it is on the roof. Those ladders are always up there, tied off, and lean, you know, within a few degrees of the side exhaust fans, so that there's always something there. We don't erect them. They are there, and we use them.

Barnes also explained that the initial wooden ladder was replaced "over the years" with "a number of fiberglass ladders," similar to the one that figured in Renwick's accident. Barnes stated categorically that PB employees "didn't do anything … touching those ladders" and affirmatively denied that the defective ladder that injured Renwick belonged to PB.[8] Other testimony was consistent with Barnes on this point. For instance, PB's operations manager, Gee, stated that "over the years, there was always a ladder up there" (i.e., on the casino roof) and he affirmatively denied that any of those ladders were provided by PB. Renwick himself testified that a ladder was "always up … fastened to the railing," that it was "just provided for us," and that PB employees "never tied off" the ladders they found already set up on the casino roof. Finally, PNK's facilities manager, Long, testified that PNK did own ladders that it maintained on the premises.[9]

---

[8] To be sure, Barnes did not testify that *PNK* owned the ladder in question; he simply testified that he didn't know who owned it. But a fact finder could infer from the other evidence discussed—such as PNK's control of access to the work-site—that PNK provided the ladder in question. All we say is that there was a genuine fact issue on this point.

[9] The district court overlooked the significance of this evidence. This was somewhat understandable, given that in opposing summary judgment Renwick relied in part on other evidence (such as photographs of the accident site and evidence that the casino vessel captain *could* have witnessed the accident) which, as the district court correctly found, fails to raise a genuine fact issue on this point. Nonetheless, Renwick's opposition also recounted the more

No. 17-30767

From this evidence, a reasonable fact finder could conclude that PNK "expressly or impliedly authorized the particular manner which … render[ed] the work unsafe." *Davis*, 865 F.3d at 236; *see, e.g., Jordan v. Travelers Ins. Co.*, 245 So.2d 151, 155 (La. 1971) (observing that "proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not"). Again, we emphasize that a fact finder could reasonably resolve the evidence for or against Renwick. We conclude only that the evidence—viewed in the light most favorable to Renwick—shows a genuine dispute and that the district court erred in granting summary judgment.

B.

We next consider the district court's summary judgment ruling dismissing Renwick's claim based on PNK's ownership or custody of a defective thing.

Under Louisiana law, liability for damages caused by defective things in one's custody or *garde* is governed by articles 2317[10] and 2317.1[11] of the Louisiana Civil Code. *See generally, e.g., Bufkin v. Felipe's Louisiana, LLC*, 2014-0288 (La. 10/15/14), 171 So.3d 851, 855. "To recover for damages caused

---

probative evidence discussed above, and for that reason we must conclude that the district court erred in granting PNK summary judgment.

[10] Article 2317 provides in relevant part: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." To determine whether a person has "*garde*" over a thing, a trier-of-fact considers "(1) whether the person bears such a relationship as to have the right of direction and control over the thing; and (2) what, if any, kind of benefit the person derives from the thing." *Dupree v. City of New Orleans*, 1999-3651 (La. 8/31/00), 765 So.2d 1002, 1009.

[11] Article 2317.1 provides: "The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case."

by a defective thing, a plaintiff must prove [1] that the thing was in the defendant's custody, [2] that the thing contained a defect which presented an unreasonable risk of harm to others, [3] that this defective condition caused damage and [4] that the defendant knew or should have known of the defect." *Luquette v. Great Lakes Reinsurance (Uk) PLC*, 16-422 (La. App. 5th Cir. 12/21/16), 209 So.3d 342, 348, *writ denied*, 2017-0136 (La. 3/13/17), 216 So.3d 806.[12] As already indicated, the district court assumed for purposes of its ruling that the ladder from which Renwick fell was in the custody[13] of PNK, and the parties agree that the ladder in question was defective[14] due to its lack of stabilization feet. The district court granted summary judgment based on the second of the four factors listed above—namely, by concluding that the undisputed evidence showed the defective ladder presented no "unreasonable risk of harm." Renwick appeals that ruling.

---

[12] This is no longer "strict" liability under Louisiana law. The actual or constructive knowledge element was added to article 2317.1 in 1996, which "effectively eliminated strict liability … turning it into a negligence claim." *Burmaster v. Plaquemines Parish Gov't*, 2007-2432 (La. 05/21/08), 982 So.2d 795, 799 n.1 (quotations omitted); Maraist & Galligan § 14.01, at 14-3 (same); *see also Bd. of Commissioners of Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., L.L.C.,* 850 F.3d 714, 729 (5th Cir.), *cert. denied sub nom. Bd. of Comm'rs of Se. Louisiana Flood Prot. Auth.—E. v. Tennessee Gas Pipeline Co.,* 138 S. Ct. 420 (2017) (observing "[t]here is essentially no difference between [article 2315 and 2317.1 claims] under Louisiana law").

[13] We think this was a plausible assumption, given the evidence that PNK controlled access to the casino and hotel premises and that PNK maintained ladders on the premises. Moreover, the custody over an injury-causing object "can sometimes be divided between two persons." *King v. Louviere*, 543 So.2d 1327, 1329 (La. 1989) (citing *Ross v. La Coste de Monterville*, 502 So.2d 1026, 1032 (La. 1987)). Indeed, the seminal case of *Ross*—involving the loan of a defective ladder—concluded that "an owner of a thing who transfers its possession, but not its ownership to another, continues to have the *garde* of its structure and is obliged to protect others from damage caused by structural defects arising before the transfer." *Ross*, 502 So.2d at 1032. Despite the 1996 change from strict liability to negligence, *see supra* n.12, "the jurisprudence on *garde* may still be relevant in determining legal responsibility for the relevant thing[.]" Maraist & Galligan § 14.05, at 14-15.

[14] "A defect" within the meaning of article 2317.1 "is a condition or imperfection that poses an unreasonable risk of injury to persons exercising ordinary care and prudence." *Wynn v. Luck*, 47,314 (La. App. 2 Cir. 9/26/12), 106 So.3d 111, 114 (and collecting authorities).

No. 17-30767

Louisiana courts employ a risk-utility balancing analysis to determine whether a defect presents an unreasonable risk of harm. *See, e.g., Reed v. Wal-Mart Stores*, 97-1174 (La. 3/4/98), 708 So.2d 362, 365 (fact finder "must balance the gravity and risk of harm against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair") (citations omitted).[15] This determination is "'a disputed issue of mixed fact and law or policy that is peculiarly a question for the jury or trier of the facts." *Broussard*, 113 So.3d 175, 183 (quoting *Reed v. Wal–Mart Stores, Inc.*, 97–1174, p. 4 (La.3/4/98), 708 So.2d 362, 364). To be sure, the unreasonable harm determination *may* be subject to summary judgment "in cases where the plaintiff is unable to produce factual support for his or her claim that a complained-of condition or thing is unreasonably dangerous." *Allen v. Lockwood*, 2014-1724 (La. 2/13/15), 156 So. 3d 650, 653 (quotes omitted). However, this inquiry may *not* incorporate the plaintiff's subjective knowledge of the defect or "awareness of the risk" because doing so would undermine Louisiana's comparative fault regime. *Id.* at 189; *see also, e.g., Rodrigue v. Baton Rouge River Ctr.,* 2016-2075 (La. 1/25/17), 209 So. 3d 93 (concluding that "[t]o the extent plaintiff was aware of the condition of the stairwell, the trier of fact may consider such evidence at trial for purposes of determining the percentage of fault, if any, to be assigned to plaintiff"). As one intermediate court recently explained, Louisiana courts "are mindful not [to] incorporate the plaintiff's comparative fault into the analysis of whether a defect presents an unreasonable risk of harm" because "[t]he plaintiff's knowledge of the defect

---

[15] The Louisiana Supreme Court has "synthesized this risk-utility balancing test to a consideration of four pertinent factors: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature." *Broussard v. State ex rel. Office of State Bldgs.*, 2012-1238 (La. 4/5/13), 113 So.3d 175, 184.

and considerations such as the extent of the risk created by the actor's conduct are more appropriate considerations for apportioning comparative fault pursuant to Louisiana Civil Code article 2323." *Rose v. Liberty Mut. Fire Ins. Co.*, 2015-1184 (La. App. 3 Cir. 5/18/16), 192 So.3d 881, 886 (citing *Broussard*, 113 So.3d at 188-89)) (internal quotation marks omitted).

In light of these principles, we must reverse the district court's grant of summary judgment on unreasonable harm. The court's analysis focuses on Renwick's own putative negligence in failing to inspect the ladder before using it, in light of PB's training and OSHA standards. But this is inconsistent with the unreasonable harm analysis under Louisiana law, which "focuses on the global knowledge of everyone who encounters the defective thing … [but] *not* the victim's actual or potentially ascertainable knowledge." *Broussard*, 113 So.3d at 188 (emphasis added). In any case, Renwick's possible negligence before using the defective ladder could be taken into account, not as a complete bar to recovery via summary judgment, but rather through comparative fault principles. *Id.* at 189 (citing LA. CIV. CODE art. 2323).

Additionally, as it did in its negligence analysis, the district court overlooked the significance of evidence from which a reasonable fact finder could conclude that PNK not only instructed PB employees to access the hotel roof vents via ladders and concealed from PB a safer means of access, but also that PNK placed and secured those ladders over the years-long course of PB's work. That kind of evidence raises genuine issues as to whether the risk posed by the defective ladder—which the district court properly assumed was within PNK's custody given conflicting evidence on the ladder's provenance, *see, e.g., Ross*, 502 So.2d at 1032—was unreasonable under article 2317.1. As before, we emphasize that a reasonable fact finder could resolve these issues for or

16

No. 17-30767

against Renwick; we hold only that the district court erred in granting summary judgment.[16]

## C.

Finally, PNK raises as an alternative ground for affirmance the argument that Renwick's putative negligence in using the defective ladder constituted an "intervening or superseding cause." With reference to this doctrine, the Louisiana Supreme Court has explained that, "[i]n situations in which there is an intervening force that comes into play to produce the plaintiff's injury (or more than one cause of an accident), it has generally been held that the initial tortfeasor will not be relieved of the consequences of his or her negligence unless the intervening cause superceded the original negligence and alone produced the injury." *Adams v. Rhodia, Inc.*, 2007-2110 (La. 5/21/08), 983 So. 2d 798, 808 (and collecting authorities) (citations omitted). However, the supreme court has cautioned that "[i]f the original tortfeasor could or should have reasonably foreseen that the accident might occur, he or she will be liable notwithstanding the intervening cause. In sum, foreseeable intervening forces are within the scope of the original risk, and hence of the original tortfeasor's negligence." *Id.* (citations omitted); *see also, e.g., Johnson v. Morehouse Gen. Hosp.,* 2010-0387 (La. 5/10/11), 63 So. 3d 87, 116 (discussing doctrine).

---

[16] The district court also emphasized Renwick's "status as a repairman who was trained on the safe use of ladders." But, as the court pointed out elsewhere in its opinion, "[a] building owner is not shielded from liability simply because the person injured was a repairman who was injured during the course of the work he was hired to do." *See Meaux*, 51 So.3d at 790. The Louisiana Supreme Court has explained that, while a "plaintiff's status as a repairman is a significant factor in determination of whether a risk is unreasonable," "any *per se* rule that an owner may never be held strictly liable to a repairman injured while repairing the alleged defect is unworkable and contrary to the fact intensive nature of the definition of 'unreasonable risk.'" *Celestine v. Union Oil Co. of California*, 94-1868 (La. 4/10/95), 652 So. 2d 1299, 1305, 1304. Furthermore, it is unclear whether Renwick qualifies as a "repairman" within the meaning of this doctrine, since he was not injured "while repairing the alleged defect" in the ladder. *Id.*

17

No. 17-30767

We decline PNK's invitation to affirm the district court on this alternative ground. We conclude, on this record, that a genuine fact issue exists concerning whether Renwick's use of the ladder was foreseeable and within the scope of the original risk and therefore not a superseding cause. On remand, the district court may consider whether to instruct the jury on the doctrine of intervening or superseding cause. But it would not be proper for this Court to resolve that issue as a matter of law on appeal.

## IV.

For the foregoing reasons, we REVERSE the district court's judgment and REMAND for further proceedings.

REVERSED AND REMANDED